J. P. HETZLER, W. J. HETZLER and KIRK HAYS v. A. A. MILLARD, R. R. WALTER and JOHN A. EPPLE, Trustees; and RAY T. DUFFORD and MINNIE DUFFORD, his wife; and SAM T. BRATTON and ELIZABETH T. BRATTON, his wife; and ALICE B. MILLARD, Appellants.—153 S. W. (2d) 355.

Division One, July 3, 1941.

*W. H. Sapp, Wm. L. Nelson, Jr., Sullivan, Reeder, Finley & Gaines* and *Ralph T. Finley* for appellants.

*Clark, Boggs, Peterson & Becker* and *Howard B. Lang, Jr.,* for respondents.

BRADLEY, C.—This is an action to determine title to land in Boone County. The venue was changed to Osage County, where judgment went for plaintiffs, and defendants appealed. We heretofore handed down an opinion in this cause reversing and remanding,

but a rehearing was ordered, additional briefs filed and the cause reargued.

The land involved lies within the city of Columbia; consists of about 15 acres, and is referred to as the park. The common source of title was John A. Stewart, deceased. Plaintiffs claim title as the grantees of the purchaser at a foreclosure sale (May 16, 1936) of a deed of trust executed by Stewart and wife November 15, 1923. Defendants, A. A. Millard, Walter, and Epple are trustees under a trust instrument executed by Stewart. The Duffords, the Brattons, and Alice B. Millard are defendants individually and as representing a class likewise affected.

Park Hill additions, Nos. 1, 2, and 3, and the park are frequently referred to in the record, and to better appreciate the situation, we here reproduce an exhibit as follows:

DEFENDANTS' EXHIBIT A.

Park Hill addition No. 1 is composed of lots 1-23; No. 2 of lots 24-100; and No. 3 of lots 101-150. The 15 acre park, the land involved, is the boot shape area.

The petition is conventional in form, except the allegations as to the classes represented among the defendants. These classes have reference to the lot owners in the respective additions who claim, in effect, to be the beneficial owners in common of the park. The answer pleads equitable ownership, estoppel, payment of the obligations secured by the deed of trust foreclosed, adverse possession, and laches. Defendants, in a cross bill, ask that title to the park be determined and adjudged in them as their interests appear, and that the deed under which plaintiffs claim be declared null and void.

Defendants, appellants here, make several separate assignments, but these may be grouped under estoppel, adverse possession, and premature foreclosure. Also, it is claimed that error was committed in refusing to reopen the case for further evidence.

The plat of Park Hill addition No. 1 was filed for record October 17, 1922; No. 2, September 30, 1924; and No. 3, November 2, 1925. Exhibit A is a consolidation ▮▮▮▮ of the three additions *and* the park which was not a part of either addition, so far as was shown by the *plats recorded*. In late 1921, or early 1922, Stewart had the area included in the three additions *and* the park, surveyed and a plat (in form as exhibit A, except legend) made. Some lots in additions 2 and 3 were sold before the plats thereof were executed and filed, and those to whom lots had been sold joined in the execution of the respective plats.

November 15, 1923, prior to filing plats of additions 2 and 3, Stewart and wife executed a seven per cent note for $36,000, due in 5 years, and payable to themselves and endorsed it in blank and delivered it to the Boone County Trust Company. To secure this note, they, on same date, executed a deed of trust to the trust company as trustee on the area embraced in additions 2 and 3, and the park, except lots 24, 26, and 30 in addition 2, and lots 104, 105 and 106 in addition 3, which lots had been sold prior thereto. "The holder or holders" of the $36,000 note were designated in the deed of trust as the "party of the third part." The description in the deed of trust was by metes and bounds and without reference to either addition or the park. On the same date, November 15, 1923, the Stewarts executed 36 seven per cent notes (hereinafter referred to as bonds) for $1,000 each, due in 5 years, payable to bearer, interest payable annually, and at the same time they executed what is called, in the record, the pledge agreement. In the pledge agreement the Stewarts were "parties of the first part;" the trust company was "party of the second part" and designated as trustee; "the holder or holders" of the 36 bonds were "parties of the third part." By the terms of the pledge agreement the $36,000 note, secured by the deed of trust,

was pledged as collateral to secure the 36 bonds. Other collateral was required to be pledged by Stewart under this pledge agreement which was contemporaneous with the deed of trust. The trust company did not advance any money on the notes to the Stewarts; the 36 bonds were sold and John A. Stewart received the proceeds. Exhibit A was attached to the pledge agreement as a part thereof. Second party, the trust company, was to say when plats were to be recorded as to additions 2 and 3 on each side of the park.

The pledge agreement recites that the Stewarts desired to develop the area (40 acres) shown on Exhibit A "as a residential section of the city of Columbia," and that a deposit with the trust company of $1,000 in money or collateral, to be approved by the trust company, would secure the release from the lien of the deed of trust of any lot in addition 2 between Broadway and Crestmere avenue, and that a like deposit of $500, cash or collateral, would release any other lot.

The whole area shown on Exhibit A was referred to by Stewart as Park Hill. Stewart advertised extensively in the local papers and otherwise; sold lots at private sale and at public auction; told purchasers and prospective purchasers face to face and in the press that the park would belong to the lot owners; would be a community park; that the ownership of a lot carried with it the ownership of a 1/150 interest in the park, and that from the purchase price of each lot there would be deposited $100 "into a perpetual park care fund," which would total $15,000. The *park feature* was attractive and admittedly enhanced the sale price of lots. The park as a *sales force* can better be appreciated from the evidence of R. E. Curtis, dean of the School of Business and Public Administration, University of Missouri. Mr. Curtis, of the park, testified:

"I have been in and about the park frequently since I moved to Columbia. There have been no changes in the boundaries of the park during that period, to my knowledge. There are trees in the park. The park extends along the course of a stream from Broadway to Garth avenue in the vicinity of Stewart road. There are trees along that stream from within about one hundred yards of Broadway clear through to the other end of the park. They spread out some distance from the stream at the lower end, and at other spots along there. The stream is a meandering stream, and there are many trees, valuable shade trees. There is a large elm tree at the very edge of Broadway, one of the largest in the city, I believe. It is an elm, but there are many oaks in the park, many kinds of trees. There is supposed to be a spring somewhere near the north end of the park. It is along the slope down from East Parkway at about the intersection of Crestmere. At the south end of that park area, there is a line of dense forest along there, along Stewart road. There is a steep slope northward from Stewart road, that is natural woods.

It seems not to have been cleared out at all. The park is sightly. It is one of the most sightly strips of land in the vicinity. This beauty was an inducement to me to buy a lot facing on that park. I would not have bought at all in the Park Hill if it had not been for this park.''

Some cash and considerable collateral, derived from the sale of lots, were turned over by Stewart to the trust company as provided in the pledge agreement, but in some instances lots were sold and no deposit made. How many times such occurred does not appear, but all lots sold were released from the deed of trust. On three occasions, the trust company, by written direction (called an indenture) of all of the bondholders (including plaintiffs, J. P. and W. J. Hetzler) released back to Stewart collateral deposited. These releases were $13,500 on October 26, 1925; $10,000 on November 15, 1926; and $9,000 on November 12, 1927, a total of $32,500. The release indentures recited that the remaining real estate not then released from the deed of trust was ample to secure the bonds, and the release indenture of November 12, 1927, the third and last one, recited that there yet remained under the lien of the deed of trust 34 lots in Park Hill No. 2, and 29 lots in Park Hill No. 3, of the value of $1,000 each, and ''fifteen acres of park'' of the value of $25,000. There was a paragraph in the third release indenture whereby the Stewarts promised that thereafter, upon the sale of a lot, $1,000 in cash or collateral would be deposited with the trust company, regardless of what lot was sold. This was not done, but if it had been, the debt would have been paid. Each of the release indentures stated that it was binding on ''the undersigned holders of said notes (the 36 bonds) and their assigns, administrators, executors, and legal representatives.''

The lot purchasers generally knew that there was a deed of trust on the lots in additions Nos. 2 and 3, but it was not generally known among them that the same deed of trust, by its terms, covered the park and its adjacent streets, East Parkway and West Parkway. While Stewart told lot purchasers that the purchase of a lot carried a 1/150 interest in the park, there was no mention of such in the deeds executed by the Stewarts. Finally, it got noised about that there was a deed of trust on the park, and John A. Epple, who contemplated the purchase of 15 lots, went (October, 1930) to see S. F. Conley, secretary of the trust company and its trust officer. Conley, in effect, told Epple that the bondholders were well secured, independent of the park, and urged him, according to Epple, to go ahead and purchase the lots, and he did. Conley suggested to Epple that the lot purchasers ''had better take the title (to the park) out of Stewart,'' and this was done October 3, 1931. On that date Stewart and wife conveyed the park, including the streets, East Parkway and West Parkway, to Epple, R. R. Walter, and himself as

trustees, "to hold and maintain perpetually as a private park for the use, benefit and enjoyment of the owners of the lots in Park Hill addition No. 1, Park Hill addition No. 2, and Park Hill addition No. 3, to the city of Columbia, Missouri, and for the use, benefit and enjoyment of all persons living within the boundaries of said additions, whether as owners or tenants, said park to be known as 'John A. Stewart Park,' " and the deed provided a plan for upkeep, maintenance, etc., and also provided for the succession of the trustees. After the conveyance of the park, all money derived from the sale of lots was applied to the payment of the bonds.

From November 15, 1923, date of the $36,000 note, deed of trust, the 36 bonds, and the pledge agreement, to November 15, 1928, maturity date of these notes, Stewart sold 55 lots in addition No. 2, and 24 in addition No. 3, and at the time of his death (April 8, 1936), and at time of foreclosure (May 16, 1936) all lots had been sold except lots 42, 44, 48, 78, 79, 87, 88, and 89 in addition 2, and the value of the lots sold prior to foreclosure was at least $125,000.

In a few days after Stewart's death, the Boone County Trust Company, trustee in the deed of trust, securing the $36,000 note, resigned and Harold Duncan, its teller, was appointed substitute trustee, and proceeded to publish foreclosure notice. At the time of foreclosure 15 bonds remained unpaid, and the amount due on each was $650. May 14, 1936, the holders of these bonds made a written request of the trust company to bid for them, at the foreclosure sale, up to $11,900, but to buy in for less if able to do so. The trust company bought for them at the foreclosure sale on a bid of $10,000, and the substitute trustee conveyed to it lots 42, 44, 48, 78, 79, 87, 88, 89, and the park area, including the streets, East Parkway and West Parkway. January 27, 1937, the trust company conveyed to plaintiffs all the property conveyed to it by the substitute trustee, except lots 79, 87, 88 and 89, sold by the trust company subsequent to foreclosure, and this cause was filed December 1, 1937.

In the prior opinion we ruled all assignments adverse to defendants, except on the question of premature foreclosure, and reversed the judgment and remanded the cause on the ground that the foreclosure in a little more than a month after Stewart's death was in violation of Sec. 140, R. S. 1939, 1 Ann. Stat., p. 88. Neither side filed motion for rehearing, but each filed motion to modify. Plaintiffs asked that the ruling that the foreclosure was premature be stricken from the opinion and the judgment affirmed. Defendants asked correction of an erroneous statement of a minor fact, and that the opinion be modified to reverse and remand with direction "to enter a decree vesting title to the park in the defendants." The court of its own motion ordered rehearing, and, as stated, additional briefs were filed and the cause reargued.

As the record stood when the cause was first submitted, the evidence of plaintiffs, J. P. Hetzler and Hays, was not in the record. Neither of the plaintiffs testified at the trial, but defendants took the depositions of J. P. Hetzler and Hays, but failed to introduce these depositions. The trial closed July 7, 1938, and the cause was submitted and taken under advisement. August 19th, defendants filed motion to reopen for additional evidence. In the motion it was stated that at the trial defendants inadvertently overlooked offering the depositions. The court stated that the motion would be sustained. Thereupon counsel for plaintiff said: "I think it is improper to permit them to use these depositions when the plaintiffs were in court" (present at the trial). The court then said: "Well, if that is the situation, I think it is improper and unfair to permit you to use the depositions, and I will overrule the motion." As we read the record at the first submission, we stated that plaintiffs did not introduce the depositions in support of the motion to reopen. The depositions were not printed in the abstract and were not before us. After rehearing was ordered, plaintiffs filed supplemental abstract bringing up the evidence of plaintiffs, J. P. Hetzler and Hays in the depositions, and plaintiffs' counsel say that these depositions were "offered in evidence" by defendants "upon their motion to reopen."

In the prior opinion we stated that it was plain that a grave injustice had been done to the lot purchasers respecting the park, and that it would appear from the motion to reopen that plaintiffs *knew* more about *the park* than the record (then) disclosed, and on oral argument on rehearing it was frankly admitted by counsel for plaintiffs that an injustice had been done the lot purchasers. It is also stated by them that if their position be correct, they have the right to close up the streets (East Parkway and West Parkway) in front of all the lots fronting on the park. They offer, however, to waive this right. The question of whether plaintiffs can enforce so strictly to the letter the mortgage given as collateral to the pledge agreement depends in equity to some extent upon their own knowledge of all conditions and their good faith under the circumstances. It appears from the depositions of plaintiffs, J. P. Hetzler and Hays, that they *did know* a great deal about the park. It appears from Hetzler's deposition that he is a director of the trustee, Boone County Trust Company, and has been for 6 or 8 years; that he has resided in Columbia for 35 or 40 years; that he was familiar with the Park Hill additions and the park. The deposition of plaintiff Hays discloses that he too was familiar with the Park Hill additions and the park and had been for many years. There is nothing in the record to show what plaintiff, W. J. Hetzler, knew about the additions and the park, but it is apparent that *the park* and Stewart's representation that it would belong to the lot purchasers received the widest publicity in Columbia for quite a few years after November 15, 1923.

We do not think that defendants have developed as fully as they may the defense that plaintiffs, when they purchased the bonds they held at the time of the foreclosure, knew of the representations made by Stewart as to the ownership of the park, and were familiar with the physical situation of the Park Hill additions and the park, or had such information as to put a reasonably prudent person to inquiry. The cause is in equity, a court of conscience. It stands conceded that a grave injustice has been done to the lot purchasers. That wrong should be redressed if it can be. A remand may be made to avoid closing the door to substantial justice, Jensen v. Wilson Township, 346 Mo. 1199, 145 S. W. (2d) 372, 1. c. 375, and cases there cited, and we think that such should be done in the present case. On a retrial all questions will be open; none will be foreclosed by our former ruling. Further development on the question of plaintiffs' knowledge as to Stewart's representations about the park may affect other questions urged herein, such as common-law dedication and estoppel.

The judgment should be reversed and the cause remanded, and it is so ordered. *Hyde, C.,* concurs; *Dalton, C.,* not sitting.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.