In re M—— P—— S——, a Minor.

No. 30641.

St. Louis Court of Appeals.
Missouri.

Jan. 17, 1961.

278

Rollin J. Moerschel, Niedner & Niedner, St. Charles, for appellant.

DOERNER, Commissioner.

This is a statutory proceeding under our new Juvenile Act, Laws 1957, pp. 642–659, Sections 211.010–211.420. On April 29, 1960, the Juvenile Officer of St. Charles County, pursuant to prior authorization, filed a petition in the form prescribed by Laws 1957, p. 642, Sec. 211.090, V.A.M.S. § 211.091, in which the essential allegations were that M——— P——— S———, was a minor, 2½ years of age; that his parents, D——— S——— and G——— S———, had neglected to provide the proper support, medical and other care necessary for his well-being; and that the appellant, his mother, who had actual custody, had wilfully physically abused and injured the child. Following a hearing on May 11, 1960, the court on the succeeding day entered a finding and judgment in which it found that the appellant had caused the child to be severely beaten and injured, and that the child was therefore in need of care and treatment; and ordered and adjudged that the child be made a ward of the court, and that his custody be transferred to the Child Welfare Worker of St. Charles County for placement in a foster home, subject to visitation by the child's parents

under the supervision of the Child Welfare Worker. Failing to have that judgment set aside the mother has appealed.

 Appellant has urged only two points in her brief: that the court erred in that there was no substantial evidence to support the finding, order and judgment; and that the court grossly abused its discretion in transferring custody of the minor from appellant to the Child Welfare Worker. If the first is meritorious the second would follow as a matter of course, so that our sole task on review is to examine the record to determine whether the finding and judgment of the court were supported by substantial and competent evidence. Respondent cites State of Missouri v. Greer, Mo.App., 311 S.W.2d 49, in support of its contention that in reviewing the record we must extend deference to the trial court's point of vantage, and indulge the presumption that the court's decision was motivated by what it believed was best for the child. We heartily concur with what was said by that court, and believe it to be peculiarly applicable in this case, but we note that the same authority likewise held that a mother is not to be deprived of the care, companionship and responsibility of her child except for grave reasons and such as are authorized by legislative enactments; that she is presumed to be qualified for the natural privilege of the primary right to custody; and that whosoever seeks to deny a mother that privilege carries the burden of proof.

Four witnesses were called in support of the petition. Bruce McClintock, the Juvenile Officer; Miss Esther Meyer, the Child Welfare Worker; D—— E—— S——, the child's father; and Dr. Otto K. Thiele, who had treated the minor.

McClintock testified that on the evening of Thursday, April 28, 1960, about 7:30 p. m., he received a telephone call at his home from the Sheriff that an injured child had been admitted to St. Joseph's Hospital in St. Charles, and that the circumstances surrounding its injuries required investigation. The following morning he called at the hospital, and upon examining the child, whom he ascertained to be M—— P—— S——, he found that the child's right arm had been broken and was in a cast; and that there were numerous bruises on the child's back, upper regions of his buttocks, and on his legs, from his hips to his ankles. The Juvenile Officer identified, and there were admitted in evidence, four photographs of the child which the witness had caused to be taken about 1:15 p. m., on April 29. Later that day, accompanied by Miss Meyer, McClintock called upon the appellant at the latter's home in St. Charles and asked for an explanation of the child's physical condition. He testified that she informed him that on Wednesday, the 27th, and again on Thursday, the 28th, the child had fallen down the steps which led from the ground floor to appellant's upstairs apartment. On cross-examination McClintock related that the appellant resided in a second floor apartment, reached by a flight of approximately fifteen steps, that they were steep, and that the risers were from 8 to 10 inches high. He also stated that the appellant's daughter (between one and two years of age) was present at the interview, and that he did not observe any bruises or scars on the exposed portions of her body. On re-direct, the witness testified that the appellant had told him she had disciplined M—— P—— S—— with a wire-handled fly swatter to teach him not to open the door of her apartment leading to the steps but that appellant had not fixed the time when she had done so.

Miss Meyer related that she had seen the child at the hospital about 10 or 11 o'clock on the morning of April 29; that he had on only diapers; that his legs were covered with bruises; and that he had a broken arm. She testified further that she had called upon appellant with McClintock, and that appellant stated the child had fallen down the stairs (she thought appellant had said the previous day) and that she (appellant) had taken him to the doctor; that his arm was broken; and that he was hospitalized. Appellant had told them, the witness testi-

fied, that she had corrected the child when he went to the door but that she never whipped him hard, nor often. Miss Meyer could not remember what the appellant had said as to the manner in which appellant had disciplined the child. She also stated that the stairs to appellant's apartment were very steep. On cross-examination the witness acknowledged that appellant had told them that the child had fallen down the steps the previous day (Thursday), and thought that appellant had also told them he had fallen down the steps on Wednesday. She stated that she had seen M———, the child's sister, during her visit; that she did not observe any bruises or cuts or scars on her that were evident, but that M——— was fully clothed; and that to the outward view M——— appeared to be a normal, happy child. Miss Meyer also placed the number of steps at about 15.

D——— E——— S———, the husband of appellant and the father of M——— P——— S——— and M———, was called as a witness on behalf of the petitioner, and testified that he and appellant had separated on April 29, 1959, and that he was living in Wellston. Asked to describe the child's appearance when he saw him in the hospital on April 30, S——— stated that the child's arm was in a cast and that he had several bruises on his back, shoulders and legs. Shown the photographs in evidence and asked if they were a fair representation of how his son had appeared, his answer was, "I would say so, outside of the bruises—the bruises look more severe here in the photographs than they did when I saw them at the hospital." He testified that he didn't know how the child had received the bruises, and when asked how appellant had treated their children while he and appellant had lived together, stated that "I thought she treated them as any mother would treat her children." He also said that appellant had never punished the children to excess.

Dr. Otto K. Thiele, who had attended M——— P——— S——— on April 28, was called as a witness by the petitioner, but it being established upon voir dire examination by the appellant that the appellant had requested his services at the hospital, and that a physician-patient relationship existed between the doctor and the child, appellant's objection as the mother and natural guardian to the competency of the doctor was sustained.

At this point the petitioner rested his case, appellant orally moved that the petition be dismissed for failure to prove the allegations made, and the court overruled the motion. Appellant then called as her first witness, Mrs. Florence Frances Gardner, who testified that several weeks before April 28, she and her husband had moved into the first floor apartment beneath appellant; that the stairs to appellant's apartment were very steep; that she had observed the child playing in the yard, and that at times appellant's children played with her daughter; that appellant was always with appellant's children when they played in the yard, and played with them; that she had never seen appellant abuse the child; and that he seemed to have a child's normal feeling towards his mother. Mrs. Gardner related that on Thursday evening, April 28, the appellant had brought the child downstairs and said that she thought his arm was broken, and had asked Mr. Gardner where the hospital was. The witness stated that she looked at the child's arm and that it was swollen and he was suffering; and that she had suggested that her husband drive appellant to the hospital, because it was a pretty good ways to drag the child. She also said that appellant had volunteered the information that the child had gotten hurt by falling down the steps. Mrs. Gardner testified that she worked at the A&P during the daytime, except on Sundays and Mondays, and that she had never seen the child fall down the steps. On cross-examination, Mrs. Gardner stated that she had not examined any part of the child other than his arm, and didn't know if he was bruised elsewhere; that there was a little lump on his arm, and it was swollen.

Roy Gardner was then called, and stated that the child had appeared to him to be a

normal child, kept pretty close to appellant, and never withdrew from appellant that he observed. He stated that he was eating supper when appellant brought the child to their apartment, stating she thought something was wrong with his arm, and that at his wife's suggestion he drove appellant to the hospital, about a mile away. According to Gardner, appellant did not explain in his presence how the child had been hurt. On cross-examination he related that appellant had shown him the child's arm, which was swollen, and that he had not examined any other parts of his body.

The appellant was then sworn, and testified that she had moved from Lincoln County to the apartment in the City of St. Charles on April 7, 1960, because the doctor there had told her the child was underweight and might be suffering from anemia, and she wanted to get another doctor's opinion. She stated there were fifteen steps, with risers of 8 to 10 inches, leading up to her apartment, which she entered by a door into her kitchen; that the door had no lock, and she had requested her landlord to put one on, but he had told her to get a gate; that she had always told M——— P——— S——— not to go on the landing at the top of the stairs, and after telling him numerous times she had given him three good whacks on his seat with the rubber part of a fly swatter; that on the afternoon of Wednesday, April 28, she had opened the door to take the children to the yard to play, as she usually did after lunch, when she remembered that M——— had not been to the bathroom; that she left M——— P——— S——— at the door and went into the bathroom, three steps away, for a minute, and then heard M——— P——— S——— falling down the steps. On Thursday, the 28th, she testified, she was ironing in the living room, and as far as she knew the child must have opened the door by himself, apparently desiring to go out to play, and fell to the bottom of the steps. She stated that he whimpered, was dizzy-like, his eyes looked funny; and he had a big bump on his head; that she carried him upstairs and laid him on the bed, and got out the baby book, and under "Injuries" it said to keep him quiet for a couple of hours if there was no nausea or concussion; that she left him on the bed while she did more ironing, but that she looked at him once in a while and he didn't act like he was in pain; and that about two and a half hours later, when she took hold of his hand to lift him off the bed he screamed because of the pain in his arm and she pushed up his sleeve and saw a great big swollen knot on his arm. She then carried him to the Gardners, told them the child had fallen downstairs and she thought his arm was broken.

On cross-examination appellant stated that she didn't examine the child's body when she took him to the hospital; that it took a long time for Dr. Thiele to work on his arm, and "they" didn't want her to stay nor did she want to impose on the people who were taking care of M———, so she went home and then returned to the hospital later that evening; that by that time the child was undressed, and it was then that she saw the bruises for the first time; that she was sure the bruises were from his falls, and the marks on his right shoulder were possibly from the iron grate located at the bottom of the steps; that she had never mistreated the child, and that his arm must have been broken in the fall; and that she didn't know how the bruises and the broken arm could have been caused in any way other than the fall, because no one had visited her.

The court then interrogated the appellant, and developed from her that both falls occurred between one and two o'clock in the afternoon; that on Wednesday she didn't undress M——— P——— S——— when she put him to bed, because he had only one pair of pajamas, which he had wet the night before and which she hadn't had a chance to wash, so she let him sleep in his clothes; that on Thursday she didn't undress the child after his fall, except for his shoes; and that she didn't notice there was anything wrong with his arm until she

started to lift him off the bed and he screamed with pain.

D———— E———— S———— was then recalled to the stand and questioned by the court. He testified that since the time he and the appellant had separated, about a year, he had visited M———— P———— S———— on an average of every three or three and a half weeks and that each visit lasted about three hours; that on those occasions he had seen appellant strike the child, but that while appellant may have been angry the striking was not abusive or in any way that a parent shouldn't strike a child, and was more or less in the form of scoldings; and that the last time he had seen the child before he went to the hospital was on the Tuesday after Easter. On recross-examination by appellant, S———— reiterated that he had never seen appellant abuse the children; and stated that she took the child to the doctor on frequent occasions, and that they were equally concerned about the anemia from which the child suffered.

At the conclusion of all of the evidence, appellant again moved for the dismissal of the petition for the reason that the evidence failed to sustain the charges, which motion the court overruled.

Appellant contends that the record is completely devoid of any evidence to sustain either the finding that the child was beaten, or that she abused the child. She points out that there is nothing in the testimony of the Juvenile Officer or of the Child Welfare Worker, either as to their own knowledge or as to the results of their investigation, from which the conclusion could be drawn that appellant mistreated the child. She emphasizes the testimony of her estranged husband that she had always treated the children "as any mother would treat her children," and that he had never seen her abuse them. Respondent concedes that there was no direct evidence on either of the above findings, but he argues that there was circumstantial evidence, and that it was sufficient to support the court's findings. The burden of the argument in respondent's brief may be fairly summarized as follows: (1) the photographs show the extent of the child's bruises and injuries; (2) they are so numerous and severe that the only conclusion which can be drawn is that they were inflicted at the hands of some person; (3) appellant alone had the custody of the child; (4) therefore, she was the one who caused the child's injuries.

That the bruises were numerous and extensive is not subject to dispute. The four photographs in the record, taken with the child in different positions, show that there were bruises on his legs, left arm, (the right is covered by a cast and the buttocks by a garment), and back. They appear to be particularly numerous on the fore and right part of the right leg, being almost continuous from the hip to the ankle, but there appear to be none on the back or inside portion of the right leg. There are other bruises on the front part of the left leg, intermittent from about two inches above the knee, to the ankle. On the left arm they appear to be confined to the area around the elbow. There is a large contusion on the back, in the vicinity of the left shoulder blade, another extending downward from the right shoulder, and others shading up and down the spinal column. While there are small, dot-like contusions at various places over the rib bones on the back, in general the bruises on all parts of the child's body are splotchy in appearance and for the most part cover a broad area. There are no welts or narrow bands, except for two stripes about an inch apart superimposed on the large bruise about the left shoulderblade, previously mentioned.

■■■■ This is a statutory proceeding, the laudable purpose of which is to safeguard and protect the child, but it partakes of the character of a "civil case" insofar as appellate procedure and review are concerned. In re C————, Mo.App., 314 S.W.2d 756. Our appellate courts have repeatedly said in civil cases that while a finding essential to recovery may be proved by circumstantial evidence, the shown circumstances must be

such that the necessary fact or facts may be inferred and must reasonably follow therefrom; that the evidence must exclude guesswork, conjecture, and speculation as to the existence of the necessary facts; and that the evidence should have a tendency to exclude every reasonable conclusion other than the ultimate and determinative result drawn, Brawley v. Esterly, Mo., 267 S.W.2d 655; Varble v. Stanley, Mo.App., 306 S.W.2d 662; Hogue v. Wurdack, Mo.App., 298 S.W.2d 492. We have studied and restudied the photographs in evidence in an effort to determine the cause of the injuries depicted. From experiences common to mankind we know that bruises of the nature shown by the photographs are usually caused by the contact of a hard or firm and blunt object or instrumentality with the body. From the same source we also know that the manner in which bruises may be acquired are numerous and varied. The photographs in evidence, while ample proof that the child was extensively bruised, are not of such a character that, standing alone, they tend to exclude every reasonable conclusion other than that he was beaten. Nor is there any other evidence in the record, including that of appellant, which aids the respondent's case. While it is obvious from the judgment that the court did not believe the testimony of appellant, the rejection of her explanation is not affirmative proof required to sustain the burden of proof resting on respondent.

■ It is possible that such evidence might have been developed had the attending physician, Dr. Thiele, been permitted to testify, but, as has been stated, appellant's objection to his competency was sustained. We are of the opinion that in so ruling the court was over-solicitous as to the rights of appellant. The privilege created by Section 491.060(5) RSMo 1949, V.A.M.S., is personal to the patient. It must be raised, and may be waived, only by the patient. Randolph v. Supreme Liberty Life Ins. Co., 359 Mo. 251, 221 S.W.2d 155; Wells v. City of Jefferson, 345 Mo. 239, 132 S.W.2d 1006; Foerstel v. St. Louis Public Service Co.,

Mo.App., 241 S.W.2d 792. Dr. Thiele's patient in this case was the child, not the appellant. It is undoubtedly true that under ordinary circumstances a parent, as the natural guardian, would have the right to claim the privilege on behalf of his child when it would be to the best interests of the minor to do so. But the circumstances here were far from ordinary. The child was not a litigant, but the subject of the proceedings, the purpose of which was to protect his interests and safeguard his welfare. In one sense, appellant stood in an adversary position, and the objection was made on her behalf, and in the furtherance of her interests, not that of her child. And, in view of the nature of the proceedings, it was clearly not to his best interests to have excluded the doctor's testimony. Where the privilege is claimed on behalf of the parent rather than that of the child, or where the welfare and interest of the minor will not be protected, a parent should not be permitted to either claim the privilege, Vance v. State, 182 Miss. 840, 183 So. 280; or, for that matter, to waive it. In re Sippy, D.C.Mun. App., 97 A.2d 455.

■ Because of a hiatus in essential proof it is obvious that the present judgment cannot stand. It is equally apparent that the efforts of the Juvenile Officer to supply such necessary proof was prevented by the adverse ruling as to Dr. Thiele's competency, on the objection voiced by appellant. Whether he can qualify as an expert, and whether his testimony when offered will be material and admissible are matters which we cannot presently pass upon, and which must be left to the judgment of the trial court. In a situation such as the present one, where it is impossible to render a final judgment because the principal issue was not adequately developed below, and the record indicates that the necessary evidence may be available, a wise exercise of our discretion requires that the judgment be reversed and that the case be remanded for a new trial. Hetzler v. Millard, 348 Mo. 198, 153 S.W.2d 355; Daggs

v. McDermott, 327 Mo. 73, 34 S.W.2d 46; Oliver v. Oliver, Mo.App., 325 S.W.2d 33.

The Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, judgment is reversed and the case remanded for a new trial.

ANDERSON, P. J., WOLFE, J., and O. P. OWEN, Special Judge, concur.