In the Interest of M—— L—— J——, a child under 17 years of age.

No. 7949.

Springfield Court of Appeals. Missouri.

April 21, 1962.

No appearances on appeal for appellant.

STONE, Judge.

In this statutory proceeding under the Juvenile Act [Secs. 211.011 to 211.431], the mother of M—— L—— J——, now about fourteen years seven months of age (hereinafter referred to as the child), appeals [Sec. 211.261] from the judgment of the juvenile court, finding that the allegations of the petition theretofore filed by the juvenile officer [Secs. 211.081 and 211.091] were true and that the child was in need of care and treatment [Sec. 211.031(1) ], making the child a ward of the court, and placing her in the custody of her maternal grandmother. Sec. 211.181. (All statutory references are to RSMo 1959, V.A.M.S.) At the hearing in juvenile court, the mother testified in person and was represented by able counsel; but, on appeal, the case has been neither briefed nor argued on behalf of the appealing mother or on behalf of the state. Since a proceeding of this character partakes of the nature of a civil action insofar as appellate procedure and review are concerned [In re C——, Mo.App., 314 S.W. 2d 756, 760(9); In re M—— P—— S——, Mo.App., 342 S.W.2d 277, 282(6) ], the appeal properly might be dismissed for failure to comply with the rules of civil procedure. See Rules 83.05, 83.06, 83.08 and 83.09, V.A.M.R.

However, although *termination of parental rights* was neither sought in this proceeding nor ordered in the judgment assailed by the mother [see Secs. 211.441 to 211.511], the effect of that judgment was to deny to a mother the care and custody of her daughter and thus to cut across a sacred and hallowed relationship, for which our courts, in common with all civilized peoples, have evidenced tender and sensitive regard. State v. Taylor, Mo.App., 323 S.W.2d 534, 537(3). As natural guardians of their minor children, parents have a primary right to custody of such children [State ex rel. White v. Swink, 241 Mo.App. 1048, 256 S.W.2d 825, 829(5); Williams v. Williams, 240 Mo.App. 336, 205 S.W.2d 949, 953(1) ], are presumed, in the absence of proof to the contrary, to be fit and qualified to exercise that natural privilege [In re Cole, Mo. App., 274 S.W.2d 601, 608(3); Cox v. Carapella, Mo.App., 246 S.W.2d 513, 514(1) ], and, as has been "the settled law from time immemorial" [Bell v. Catholic Charities,

Mo.App., 170 S.W.2d 697, 699(1) ], never should be denied their right, by nature and by law, to have such custody unless it is made manifest to the court that, for some strong and cogent reason, they are unfit or incompetent to care for their children or unless the welfare of the children, for some special or extraordinary reason, demands a different disposition. In re Richardet, Mo. App., 280 S.W.2d 466, 471(2); Swan v. Swan, Mo.App., 262 S.W.2d 312, 314(2); Wilson v. Wilson, Mo.App., 260 S.W.2d 770, 776(5); Edwards v. Engledorf, Mo. App., 192 S.W.2d 31, 33(2). It follows that whosoever would deny to parents the custody of their minor children must carry the burden of proving the parents' unfitness. State v. Pogue, Mo.App., 282 S.W.2d 582, 588(9); I—— v. B——, Mo.App., 305 S.W. 2d 713, 719(5). In the case at bar, the transcript is on file and no motion to dismiss the appeal has been presented. Conscious of the effect of the judgment and mindful of the concern with which courts should and do scrutinize any attack upon or disruption of the mother-daughter relationship, we have, *sua sponte,* critically examined and carefully considered the evidence preserved in the transcript.

█ Family tragedy beset the child at an early age when the marriage of her parents went down the all-too-familiar drain of separation and divorce. By the decree, custody of the child, then two years of age, was granted to the mother. In February 1951 the mother went to St. Louis and obtained steady employment with "internal revenue, civil service." The child remained with the maternal grandmother in the home town in Southeastern Missouri until 1954, when both of them went to live with the mother. Thereafter, the three generations (i e., grandmother, mother and child) lived together in St. Louis, until the grandmother returned to the home town in January 1960 "to help take care" of her father. In June 1960, after the close of the school year, the child went to the home town and thereafter has lived with the grandmother. This proceeding was instituted when the mother undertook to take the child to St. Louis in September 1960.

At the hearing on the petition filed by the juvenile officer, the mother occupied the unenviable position of defending her parental fitness against charges leveled by the brokenhearted but blunt-spoken grandmother and the disillusioned, distressed, disturbed child. As the grandmother related it, sometime during the interval between 1954 and 1960, the mother "took up" with one S——, identified as a married man with "a wife and three boys" who "drank a whole lot, you couldn't fill him up." After learning about the marital status of S—— and the trouble which the mother had caused "between him and his wife," the grandmother told the mother "she couldn't have nothing to do with him any more (and) the little girl mustn't ride with him." Although (so the grandmother said) the mother agreed, the extent of her obedience appears to have been that thereafter the mother did not bring S—— into the house *while the grandmother lived in St. Louis* but met him "in the alley." The principals became so enamoured of this association that morning after morning the mother would pass up breakfast with the grandmother and the child and would "go off and eat breakfast with him" before she went to work.

Turning our attention to the other end of the day, the grandmother said that, after the family group had moved to another location in St. Louis, the mother "never come home I don't think one time after work and eat supper with us what time I was there." She might have returned to the apartment one evening each week by eight o'clock, but "the rest of the nights she'd be out, specially Friday night, because she didn't have to work the next day, stayed out real late that night, and went off on weekend trips, supposed to be going with girl friends, and we didn't know where she went." At night, she would "come in smelling like a tavern"— "she had been drinking, you could smell it on her breath, bleary-eyed." The mother "didn't do that until she took up with this man."

The child's testimony was as devastating as that of the grandmother upon the basic issue of the mother's fitness. After confirming the grandmother's statement that she would not tolerate S—— in the apartment while she lived in St. Louis, the child added that "since she (grandmother) moved away he (S——) was there." In the child's language, her mother "worked late and she'd come home late, and that man would usually be with her, she'd have liquor on her breath, and usually she wasn't very mean to me but when she'd come home she'd argue with me and she might hit me or something like that." When asked how she "got along" with S——, the child said that "we didn't argue or anything, but he'd come there and he'd get whatever he wanted . . . and he'd tell me when to come in and when to do this, boss me." Still reporting through the child's lips, "one time she (the mother) went to get her hair fixed and he (S——) come back home and he ironed her clothes." The child was not sure "how many nights" S—— had stayed in the apartment—"I would go to bed before they would"—but "he has stayed about two nights I know of." "One time I knew, and I was pretty sure the other time"—"she told me that he stayed, that was the time she got mad at him . . . and she called up his wife." On another occasion, when the child awoke about 7 A.M. "he was standing—he was talking to her (the mother)." Agreeing on cross-examination that she had been taken "to places like the zoo, movies," the child explained that "either he'd come and take us or we'd meet him there . . . almost everywhere we went, he'd go along."

When her counsel inquired whether "this (was) any more than an acquaintanceship, did you ever do anything out of the ordinary with Mr. S——," the mother quickly agreed "I certainly haven't." But, whatever the nature and extent of her relationship with S—— might have been, she admitted knowledge that he was married when she began to "see him off and on." And, although undertaking to justify her *initial*

association with S—— on the ground that "he told me he was *separated* from his wife at that time," she conceded that "I found out later that they were living together." Answering the court, the mother first said "I've seen him (S——) about once every three or four weeks," but to the next succeeding question she said "well, average about four or five times a month." In any event, she and S—— frequently had taken the child with them; and, with a note of pride as if thereby to demonstrate the wholesome character of the child's association with S—— (although, as the mother admittedly knew, he had been "in some kind of lawsuit" for "separate maintenance" or "support" of his own children), the mother's answers came babbling out that she and S—— "take her to the movies, take her roller skating, take her swimming, take her to the park, barbeque, take her fishing"— "we've taken her to . . . the Moose Club over in East St. Louis or Wood River . . . we had a fish dinner that night and they had an orchestra." But, in all of their gadding and going hither and thither, neither the mother nor S—— took the child to any church. It was, as the child said, the grandmother who "started me" in Sunday school and church at St. Louis—"she'd go and mom wouldn't."

The mother had given S—— a present during the Christmas season preceding the hearing—the grandmother had heard "the price" and thought that the gift was a Polaroid camera but, according to the mother, it was only "a fish skinner." That there had been no termination of or interruption in the relationship of the mother and S—— was demonstrated by the further testimony, developed by the court's questions, that shortly prior to the hearing S—— had brought the mother from St. Louis to the judge's chambers in Southeastern Missouri and had endeavored to participate in a conference about the child. On that trip both the mother and S—— had stayed overnight at a nearby motel but, as the mother explained, "I had Room 17 and he had Room 18." We should not leave the mother's tes-

**512**

timony without specific reference to her uncertain but revealing answer, in response to an inquiry as to who would care for the child if the mother took her to St. Louis, that "there's a lady that lives on the first floor, Mrs. W——, she isn't working, and I haven't asked her or anything, but I do think maybe she would take care of her, because she isn't working."

The burden of the mother's plea to the trial court seems to have been that, since she had provided adequate funds for the child's support, there could be no basis for a charge that the child had not been cared for properly. In this, the myopic mother has lost sight of the verity that all else in her child's life will become empty, hollow and meaningless unless complemented and crowned by the inculcation of high ideals, the development of good character, and the preservation of decency, morality and virtue. Our society speaking through its elected legislative representatives wisely recognizes in the Juvenile Act [Sec. 211.-031] that a child may need the care, for which provision is made in that Act, not only for neglect or refusal to provide proper financial or material support [Sec. 211.-031, subd. (1) (a)] but also where the child "is otherwise without proper care, custody or support" [see subd. (1) (b)] or where, as was charged in the petition of the juvenile officer in the instant proceeding, "(t)he behavior, environment or associations of the child are injurious to his welfare . . ." See subd. (1) (c). On the record before us, we cannot escape the conclusion that to return the child to the mother necessarily would involve a not inconsiderable and wholly unjustified risk that the child might tread the same primrose path and seek the same fleshpots, for it is a timeless truth that "as is the mother, so is her daughter." Ezekiel 16:44. On the other hand, there is no reasonable room for doubt but that the grandmother is laboring with dedication, devotion and diligence to "train up (the) child in the way (she) should go." Proverbs 22:6. Bitter as the court's judgment may have been to the

mother, her own conduct brought that condemnation upon her. The best interests of the child obviously were served by the judgment and it should be and is affirmed.

RUARK, P. J., and McDOWELL, J., concur.