**STATE of Missouri (Plaintiff), Respondent,**

**v.**

**Winthy COUCH, James Couch, Kimmy Couch, Garry Couch, Margaret Couch, Nancy Couch, Homer Couch, Walter Couch, and Robin Gail Couch (Defendants), Homer Couch and May Couch, parents of defendants, Appellants.**

**No. 29545.**

St. Louis Court of Appeals.

Missouri.

Sept. 18, 1956.

Thurman, Nixon & Blackwell, Earl R. Blackwell, Hillsboro, for appellants.

W. H. S. O'Brien, Pros. Atty., Jefferson County, Festus, Irvin D. Emerson, Asst. Pros. Atty., Jefferson County, Hillsboro, for respondent.

WEINSTEIN, Special Judge.

The present appeal is a sequel to a prior and unsuccessful attempt to appeal from an order entered by the Circuit Court of Jefferson County, Juvenile Division, on January 11, 1955, adjudging Margaret Couch to be neglected, removing her from her parents' (appellants') home and placing her under the supervision of the Child Welfare Office. When this matter was originally presented to this Court, we dismissed the appeal as premature, 285 S.W.2d 42, for the reason that the order of January 11, 1955,

had made no final disposition of the eight brothers and sisters of Margaret, all of whom were named in the same neglect petition with Margaret. Since then, however, the following proceedings were had before the Juvenile Court in the same case. On January 10, 1956, the Juvenile Court entered its order finding the issues against the State as to the eight Couch children other than Margaret. Thereafter the parents of the Couch children filed their motion for a new trial, which was on January 17, 1956, overruled. Defendants' notice of appeal was then filed on January 20, 1956.

■ Appellants complain in their brief under "Points and Authorities" that the Juvenile Court erred in finding and adjudging Margaret a neglected child because such finding and judgment was against the weight of the evidence, was without support in the evidence, and that the Juvenile Court also erred in admitting hearsay evidence over the objections of the defendants. Our review of the proceedings is, accordingly, limited to these matters, which are the only points contained in appellants' brief under their "Points and Authorities". Sykes v. Stix, Baer & Fuller Co., Mo.App., 238 S.W.2d 918, 920(6).

The transcript of the evidence shows the following relevant testimony on behalf of the State of Missouri was introduced without any objection from defendants.

Dr. Carl Rice, a practicing physician in Jefferson County and Director of the Jefferson County Health Unit, had examined Margaret Couch and found that Margaret was a small girl weighing about forty-two pounds and fairly well developed. The doctor also found that she had numerous scars on her body, one of which was two inches long across the back of her left wrist, another scar on her forehead at the hair line, also about two inches long, and four or five scars on her scalp. Her nose had been fractured and was "pretty badly defective". The doctor's examination further disclosed a scar in the soft palate of Margaret's mouth that particularly concerned him. He testified that in his opinion a sharp instrument had caused this particular scar.

A sister of Mrs. Couch (the mother of the children), Esther Weidman, testified that Marilyn, an older sister of Margaret, lived with the Weidmans except for a period of five months when Marilyn was returned to her parents, and upon Marilyn returning to the Weidman home Marilyn had told of being whipped by her mother with her father's belt. Mrs. Weidman testified that when Marilyn returned to her home after the five months' stay with her parents, she had found black marks on Marilyn's back. This witness also testified that she saw scars on Margaret and also saw her broken nose.

Another sister of Mrs. Couch, Lottie Hackler, testified that Mrs. Couch brought Margaret to the Hackler home in St. Louis after writing Mrs. Hackler that Margaret had fallen from a bicycle and was hurt. Mrs. Hackler stated that after washing and cleaning Margaret the following occurred: "I said to the mother, 'I want you to take this little girl to the doctor, her nose is broken.' She said, 'I will some time.' I said, 'If you don't I am going to have something done about this.' She never took her I don't guess. I went to my sister's, Mrs. Weidman's, to see about it. When I washed her up and cleaned her up she was black and blue all over. I don't think you could put a pinpoint between the blue spots on her back. Q. She was black and blue all over? A. Yes, sir."

This witness also testified as follows:

"Q. Did you see Margaret last summer? A. Yes, sir.

"Q. What is the condition of her nose, is it still flat? A. Yes, sir, it has gone down on her face and ruined the looks of her.

"Q. Do you know the attitude of the mother towards the children? A. She has always been pretty good to the boys, but I can't say she has been so good to the girls.

Margaret couldn't sit down and eat a meal. She would always cry. She said, 'If you don't go ahead and eat you are going to get in trouble.' I think the little girl was so nervous and scared she couldn't eat. I took a cake down one time when I went and she gave all the kids a piece of cake but Margaret. She said, 'She'll get it directly when she needs it.' Those are the things I saw."

The defendant, Homer L. Couch, father of the children, testified on his own behalf that he saw one of his boys push Margaret off a swing causing her to fall and break her nose. He also saw Margaret sitting on the edge of a chair when in some manner she "threw her arm over and got the cut". The father also testified that he saw bruises on Margaret "when the boys threw sticks at her"; that he did not make it a practice "of letting the boys throw sticks at her" but that "they have to play together some way". He knew about the scars on Margaret's body and that they happen when the boys play with her when she would fall down. He admitted that Margaret's nose is deformed.

Mrs. Joe Butler testified that when she was a next-door neighbor of the Couch's, she never saw the Couch parents mistreat the children. However, on cross-examination she admitted that the Couches had moved away about two years before the hearing and that the Couch children play "pretty rough".

■ The evidence adduced at the hearing, without objection from defendants, is sufficient to justify both the finding that Margaret was a neglected child and the order removing her from her parents' home and placing her under the supervision of the Child Welfare Office. The Juvenile Court, we believe, could only find, as it did, that Margaret was "mistreated" and was, accordingly, in need of the care and protection of the State in accordance with the provisions of Sec. 211.380 RSMo 1949, V.A.M.S. And in removing Margaret from her parents' home and placing her

with the Child Welfare Office of the County, the Juvenile Court was acting in accordance with the provisions of Sec. 211.-390 RSMo 1949, V.A.M.S.

■ It has been said of the Juvenile Court that it is basically a court of individualized justice, recognizing the individuality of a child and adapting its orders to meet the requirements of each situation which is presented. But it is nevertheless a legal tribunal in fact limited in its jurisdiction by the statute law which established it. Chapter 211 RSMo 1949, V.A.M.S.; State ex rel. Dew v. Trimble, 306 Mo. 657, 269 S.W. 617. The Juvenile Court, although it was created specifically to help children, and this is its prime justification for continued existence, is equally charged with the obligation to safeguard the legal and constitutional rights of the child and its parents, giving consideration to the important factor that action under the Juvenile Court statutes is the exercise by the state of its supreme power over the welfare of its children. This power exerted by the state, parens patriae, is asserted in its right to supply proper custody and care in lieu of that of which neglected and delinquent children are deprived, and not for the punishment of the child. Thus procedural safeguards prescribed by constitution, statutes, and Supreme Court rules, in criminal cases have no application to Juvenile Court proceedings. State ex rel. Matacia v. Buckner, 300 Mo. 359, 254 S.W. 179; Ex parte Naccarat, 328 Mo. 722, 41 S.W.2d 176.

■ A fundamental concept of our society is the paramount right, under normal conditions, of parents to the custody of their children and the concurrent obligation of the parents to meet the needs of their children and to provide their material and moral requirements. If the parents fail in their obligation to protect and care for their children, society has an obligation to intervene to protect the child and society. In such event, the parental obligation to care for and protect the child must be as-

sumed by society with the consequent curtailment of the parental rights. Morrison v. State, Mo.App., 252 S.W.2d 97, 102(5); State ex rel. White v. Swink, 241 Mo.App. 1048, 256 S.W.2d 825, 829(5) (6). Such restriction of parental rights must be in accordance with due process and limited to the extent necessary to achieve the most desirable goal, wherever possible, of reinstating the natural and normal parent and child relationship.

We conclude, therefore, that both under the evidence, admitted without objection from defendants, and under the law, the Juvenile Court was justified in placing limitations on the defendants' parental rights. The judgment appealed from is, accordingly, affirmed.

ANDERSON, P. J., and RUDDY, J., concur.