**ABCO ASSISTING BUILDING CONSTRUCTION OFFICE, Inc., a corporation (Plaintiff), Appellant,**

v.

**BAGLEY & COMPANY, a corporation (Defendant), Respondent.**

No. 29692.

St. Louis Court of Appeals.

Missouri.

July 2, 1957.

Gordon W. Eliseuson, St. Louis, for appellant.

Lashly, Lashly & Miller, John H. Lashly, Grove G. Sweet, St. Louis, for respondent.

ANDERSON, Judge.

This is an action by ABCO Assisting Building Construction Office, Inc., a cor-

poration, as assignee of Ernesto Geroth-wohl, against Bagley & Company, a corporation. The action is for damages for an alleged breach of a contract for the installation of a radiant heating system in a building constructed by plaintiff's assignor. Plaintiff alleged that the defendant failed to fulfill said contract in that it designed and installed the radiant heating system in so negligent and unskillful a manner that the building was inadequately heated, contrary to the express provisions of the contract "in that portions of the building become overheated and the balance of the building is insufficiently heated; that the heating pipes are so improperly installed that portions of the tile floor covering have buckled because of excessive heat, and it has become necessary to replace portions of said tile floor covering; and that while defendant, under the terms of said contract, specifically warranted to so install the heating system so that the building could be heated to an inside temperature of not less than 75 degrees when the outside temperature was 10 below zero, it is impossible to achieve such temperature in all portions of the building when the outside temperature is considerably warmer than 10 degrees below zero; that said heating system is wasteful and inefficient and requires an excessive amount of fuel to operate it."

It was further alleged that plaintiff had expended approximately $250 and would in the future be required to expend additional sums; that his fuel costs have been excessive and will continue to be excessive, all to plaintiff's damage in the sum of $1,250. It was further alleged that plaintiff's building had been depreciated in value in the sum of $8,500. The prayer of the petition was for damages in the sum of $12,000, and costs.

The defendant in its answer admitted the corporate existence of plaintiff and defendant; admitted the execution of the contract and the assignment of said contract to plaintiff; and admitted that Gerothwohl had paid defendant $890, as in the petition

alleged. Each and every other allegation of said petition was denied.

The case was tried to the court and resulted in a finding and judgment in favor of plaintiff in the sum of $460, and costs. Neither plaintiff nor defendant filed a motion for new trial. Plaintiff, in due time, appealed.

In the winter of 1952–53 Mr. Gerothwohl erected a combination office and residence at 5811 Hampton Avenue in St. Louis. He designed the building and acted as general contractor during the period of construction. He let subcontracts in accordance with plans and specifications which he provided. The original plans called for a convector hot water system of heating, but these plans were discarded and a contract for a radiant heating system was entered into with defendant.

A radiant heating system consists of a boiler from which, by means of one or more pumps or "circulators", hot water is forced into one or more supply manifolds or "headers" and thence into a number of circulating tube assemblies called "panels" or "coils", which are embedded in the floor or ceiling of the structure to be heated, and thence into one or more return manifolds and back to the boiler. Each panel has a supply and return line with a separate valve to regulate the flow in the particular panel or coil. There were nine such "coils" in the building in question. In practice, these separate valves are used to regulate the heat in areas served by particular panels by regulating the flow of hot water through the panels. Regardless of the number of panels or coils used to heat particular parts of a structure, if all come from a single manifold or "header" driven by a single pump or circulator, the system is known as a "one zone" system. For an additional "zone", a separate circulator, manifold and thermostat are required.

The defendant designed and installed the heating system. Mr. Gerothwohl did not participate in its supervision and had no technical knowledge sufficient to qualify him

to do so. In his negotiations with the defendant company Mr. Gerothwohl dealt with a Mr. William Bagley. Mr. Bagley, who was not with the defendant company at the time of the trial, was not called as a witness. The only testimony regarding the negotiations was given by Mr. Gerothwohl. He testified he told Mr. Bagley that he would consider a radiant heating system if a substantial saving could be effected by its installation. Mr. Gerothwohl further testified that in the course of the negotiations Mr. Bagley had suggested that the ceiling of the basement for the whole building should be insulated. Mr. Gerothwohl stated he agreed to insulate all of the basement ceiling except that portion over the garage; that he refused to insulate over the garage "for technical reasons which I am afraid are a little difficult to explain"; and that Mr. Bagley agreed it would not be necessary for the reason that the concrete was to be five inches thick over the garage.

The radiant heating system was actually designed by Mr. Walter Eble, an engineer who was at the time Vice-President of the company. He designed the layout for a two-zone system to be hooked up as a one-zone system. The purpose was to keep down the cost.

The evidence further shows that after defendant's employees had placed the water pipes for the heating system in position, in what was to be the ceiling of the basement, concrete was then poured over the pipes. Most of the area over the basement was to be covered to a depth of two and one-half inches, but the floor over the basement garage was to be five inches thick. Mr. Gerothwohl testified that when the concrete contractor undertook to pour concrete over the installed heating panels, the pipes floated to the surface. He called defendant's office for instructions but was unable to contact any one who knew what to do. Because the concrete would set in a short period of time it was necessary to immediately fasten the pipes below the surface of the wet concrete. This was done.

Mr. Gerothwohl moved into the building in February, 1953. Defendant company then undertook to "balance" the system, that is, to adjust the valves on the individual panels so that the temperature in all parts of the building would correspond to the thermostat setting. The results of this procedure were not wholly successful on account of weather conditions. The weather was not cold enough to give the system proper balance.

Mr. Gerothwohl testified that the system did not operate in a satisfactory way, and by no means in accordance with the terms of the contract. He stated that the system was in use during the winters of 1953–54 and 1954–55, and during that time failed to heat adequately, especially in cold weather. Certain rooms overheated and other rooms were not sufficiently heated. The office, located at the southeast corner of the building, could not be heated to 70 degrees on cold days, while the temperature in Mr. Gerothwohl's private office was so hot that it was necessary to close the vent at all times. There was only one thermostat installed to control the heat for the entire building, including the residential quarters. The thermostat was located in Mr. Gerothwohl's private office, which was easily heated because the pipes which supplied the other rooms ran under the floor of that office.

Mr. Clarence Gay, a consulting engineer, testified as a heating expert on behalf of plaintiff. He stated that on January 23, 1955, he inspected the heating system at the request of Mr. Gerothwohl. He made room temperature checks and found quite a wide variation of temperatures. The range of temperatures varied in the different rooms from a high of 88 degrees in a closed corridor to a low of 70 degrees in the technical office. In Mr. Gerothwohl's office, with the valve closed 100%, the temperature was 75 degrees. In the living room, located in the northeast corner of the building, the temperature was 82 degrees, with a partially opened valve. The dining room was 78 degrees, with the valve partially open.

The guest room was 75 degrees, with the valve partially open. In the kitchen the reading was 78 degrees, with the valve open ⅛th of a turn. The southwest bedroom was 74 degrees, with the valve 100% open. In the garage, which received its heat from the coil in the ceiling, which was the floor of the technical office, the temperature was 72 degrees. He stated that he also checked the temperature of the slab which is the floor of the technical office and ceiling of the garage. On top of the slab, in the technical office, the temperature was 85 degrees near the outside wall, and 93 degrees toward the center of the room. On the bottom of the same slab (ceiling of the garage), the temperatures in the approximate same points were 93 degrees and 106 degrees respectively. This indicated that more heat was being thrown down into the garage than ought to be, which could be due to the coils not being properly located in the concrete slab, that is, closer to the surface on the basement side than to the technical office side. He further stated that, in his opinion, based on his inspection, the heating system was not adequate, and that a temperature variance of over 3 degrees either way from the thermostat setting was not satisfactory. He stated that a large part of the trouble could be corrected by installing a second zone—one to, serve the office area, and the other to serve the home area. He also stated that a more even balance could be obtained by installing a second thermostat to operate the second circulator which would supply heat to the home area separate from the office area. He also recommended that two electric heat panels be installed in the walls of the technical office to supply additional heat; and that the basement ceiling below the technical office be insulated with Celotex to prevent heat loss downward. He stated that it was hard to say how much effect such insulation would have on the heating conditions above; that it might simply result in a decreased temperature drop in the heating medium, that is, the water, and not provide extra heat for the upper office.

Mr. Eble, testifying for the defendant, stated that he obtained a copy of Mr. Gay's report. From this he first learned there was no insulation in the garage ceiling, and stated that this "according to our original figures was a must, so Mr. Gay's recommendations there were strictly in line. * * * He recommended that the thermostat be relocated, which I agreed with. He also recommended that a two-zone system be installed, which I agreed with. I think it is a must." He testified that a two-zone system would alleviate the excess heat condition in the corridor and in Mr. Gerothwohl's private office.

Mr. Gerothwohl testified that, based on the recommendations of Mr. Gay, he installed electric wall heating panels in the southeast corner apartment or technical office at a cost of $215; that he installed Celotex in the ceiling of the garage at a cost of $222.63, and steel storm sash at a cost of $320.50.

There was no evidence that Mr. Gay recommended the installation of storm sash. Mr. Gerothwohl testified that the storm sash was installed as an experiment. Mr. Gay testified that storm sash would help improve the heating of the building, but that it was problematical as to how much; that it would cut down the heat loss and infiltration of air from the outside, which was true no matter what heating system was used.

The court, in a written decision, found that defendant, having knowledge of the necessity for a two-zone system, failed to apprise plaintiff of that fact; and, having rendered substantial but defective performance, was liable to plaintiff for the amount required to remedy the defects. The court also held that no recovery could be had for the cost of installation of electric wall panels, Celotex insulation, or the storm sash. The court also was of the opinion that the sum of $460 should adequately defray the cost of the conversion of the heating plant into a two-zone system. A judgment for

plaintiff in said amount, together with costs, was accordingly entered.

The appellant urges that the court erred in refusing to allow as items of damages the amounts expended by it for the installation of electric wall panels in the technical office, the application of Celotex to the ceiling of the garage, and the installation of steel storm sash. Respondent contends that the issue is not properly before us for review, for the reason that it is not preserved in a motion for new trial.

Under Section 510.310 RSMo 1949, V.A.M.S., and Supreme Court Rule 3.23, 42 V.A.M.S., a motion for new trial is a prerequisite to appellate review, except in certain instances. Those exceptions are questions of jurisdiction over the subject matter, questions of the sufficiency of the pleadings to state a claim or defense, questions of the sufficiency of the evidence to support the judgment in jury waived cases, and questions presented in certain after-trial motions. The point raised on this appeal does not fall within any of these exceptions. The allegation of error concerns only the amount of recovery.

An objection that a recovery is excessive or inadequate is a matter that should first be presented to the trial court in a motion for new trial. Orr v. Rode, 101 Mo. 387, 13 S.W. 1066; Turner v. Johnson, 95 Mo. 431, 7 S.W. 570; Tabor v. Ford, 241 Mo.App. 254, 240 S.W.2d 737; 4 C.J.S. Appeal and Error § 388, p. 835. This is true in jury waived cases, notwithstanding the fact that the statute (§ 510.310, supra) provides that in such cases "the appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature." It is well established that in an equity case, in order to preserve for review allegations of error, it is necessary that they first be presented to the trial court in a motion for new trial. Aetna Ins. Co. v. O'Malley, 343 Mo. 1232, 124 S.W.2d 1164; Olson v. Olson, Mo.App., 184 S.W.2d 768.

Since the matter complained of was not preserved for review, we have no alternative but to affirm the judgment. It is so ordered.

RUDDY, P. J., and MATTHES, J., concur.