In the Interest of Gunda BURGESS, Ralph Burgess, Faith Burgess, Loren Lee Burgess, and Billy Burgess, Children under 17 years of Age.

STATE of Missouri, Harold S. Hutchison, Maries County Juvenile Officer, Petitioner, Respondent,

v.

Frank C. BURGESS, Respondent, Appellant.

No. 8069.

Springfield Court of Appeals.

Missouri.

July 30, 1962.

———◆———

Weldon Moore, Rolla, for appellant.

Harold S. Hutchison, Pros. Atty. for Maries County, for respondent.

McDOWELL, Judge.

This is a statutory proceeding under the new Juvenile Act, [Sections 211.011 to 211.-431], 1957 Cumulative pocket part to 12 V.A.M.S.; Laws of 1957, pp. 642–659, as amended by House Bill No. 437, Laws of Missouri 1959.

On July 10, 1961, Harold S. Hutchison, Juvenile Officer of Maries County, pursuant to prior authorization, filed a petition in the form prescribed by Section 211.284, Laws of Missouri 1959.

The first amended petition reads: "Comes now, Harold S. Hutchison, Juvenile Officer, within and for the county of Maries and State of Missouri, and upon his official oath informs the Court that Gunda Burgess, Ralph Burgess, Faith Burgess, Loren Lee Burgess and Billy Burgess, are presently residing in Maries County, Missouri, at the home of Frank C. Burgess and Helen Annette Burgess, foster parents of the above children near Hayden in Maries County, Missouri.

"2. That Gunda Burgess was born November 17, 1947, and Ralph Burgess was born November 5, 1951, Faith Burgess was born August 10, 1953, Loren Lee Burgess was born October 13, 1954, and that Billy Burgess was born November 21, 1955.

"3. That the natural mother of the above named children is Margaret Bogner and that her last known address was in the suburb "of Schwabischall, Western Germany and that their father's name is unknown but was purported to be an American soldier stationed in Germany and now in the United States.

"4. That the above named children were supposed to have been adopted in Germany and brought to the United States by their foster parents, Sgt. Frank C. Burgess and Helen Annette Burgess who are now residing near Hayden, Maries County, Missouri.

"5. That the above named children are without proper care, custody and support in that the foster father has been stationed at Ft. Leavenworth, Kansas, and for the past several months the foster mother has been working at Meta, Missouri, and leaving the children unattended from 10 to 12 hours a day—5 to 6 days a week.

"6. That the behavior, environment and associations of the children are injurious to their welfare in that for the past two years the foster mother, Helen Annette Burgess has on repeated occasions inflicted excessive punishment on said children to the point where it endangered their life and limb.

"7. That the parents, being financially able have wilfully neglected to provide the children with the necessary subsistence, and other care necessary for their health, morals and welfare.

"WHEREFORE; your petitioner prays the court to take jurisdiction over the persons of said children and for such other

and further orders as to the Court may seem just and proper."

The cause was heard by the court and judgment rendered August 22, 1961, wherein the court found that a proper petition was authorized and filed by the Maries County Juvenile Officer; that summons was duly served on Frank C. Burgess and Helen Burgess, husband and wife, being the purported adoptive parents of the five children involved; that said children were purportedly adopted by Frank C. Burgess and Helen Burgess in West Germany and brought to this country; that Sgt. Burgess was then and is now a member of the U. S. Army, stationed at Fort Leavenworth, Kansas. The judgment states:

"It is found that during the time said children have been in the actual custody of Sgt. and Mrs. Burgess, they have been punished repeatedly in a cruel and inhuman manner leaving scars on the bodies of certain of the children and that the beatings "administered to the children, particularly the three oldest ones, by Mrs. Burgess caused two of the children, namely Ralph and Faith, to run away from home. That said older children appeared at school on repeated occasions with physical injuries they have now said were administered by Mrs. Burgess. It is found and determined that Mr. and Mrs. Burgess have wilfully neglected to offer and provide the children with proper and necessary parental care essential to the morals, health and welfare of said children; for all of which and in the best interest and welfare of said named five children the parental rights of Frank C. and Helen Burgess should be and same hereby are terminated.

"The guardianship and legal custody of said five named children are transferred to and vested in the State Division of Welfare, said children being made wards of this Court, and the Division of Welfare is authorized to place children in suitable home or homes, all until further order."

From this judgment Frank C. Burgess and Helen Annette Burgess, parents of the above named children, filed notice of appeal to this court.

Respondent has filed a motion to dismiss this appeal on the ground that no appeal is provided by statute.

The sections of Chapter 211 RSMo 1959, V.A.M.S. relating to the termination of parental rights were enacted in 1959 by the General Assembly, House Bill No. 437. At the time of the enactment of this amendment, section 211.261 of the revised statutes of Missouri, as amended, in 1957, provided:

"An appeal shall be allowed to the child from any final judgment, order or decree made under the provisions of sections 211.-011 to 211.431 and may be taken on the part of the child by its parent, guardian, legal custodian, spouse, relative or next friend. An appeal shall be allowed to a parent from any final judgment, order or decree made under the provisions of sections 211.011 to 211.431 which adversely affect him. Notice of appeal shall be filed within thirty days after the final judgment, order or decree has been entered but neither the notice of appeal nor any motion filed subsequent to the final judgment acts as a supersedeas unless the court so orders."

House Bill No. 437 enacted in 1959 merely *amends* Chapter 211 RSMo 1957 Supp., V.A.M.S. relating to delinquent children by adding seven new sections relating to the same subject matter and providing, in certain cases, for the termination by the juvenile court of parental rights to children. It, in no way, undertakes to *repeal* section 211.261 under which the right of appeal is given. The question was raised when the Revisor of Statutes in 1959 changed the reference from (this chapter) to (sections 211.011 to 211.431). Section 211.261, as contained in the 1957 Act, made reference in two places to (this act). However, the change from reference to (this chapter) to (sections 211.011 to 211.431) as published in the 1959 statutes, would certainly cover section 211.261 as contained in the Act of 1957.

The Revisor of Statutes, acting under authority granted in § 3.060 RSMo 1959, V.A.M.S., had no authority to alter the sense, meaning or effect of any legislative act but may renumber sections or parts of sections thereof, change the wording of headnotes, rearrange sections, change reference numbers or words to agree with renumbered chapters or sections, substitute the word "chapter" for "act" or "article" and the like.

■ The basic rule of the statutory construction is to seek the intention of lawmakers and, if possible, to effectuate that intention, and courts should ascertain legislative intent from words used if possible and should ascribe to language used its plain and rational meaning. State ex rel. Wright v. Carter, Mo.Sup., 319 S.W.2d 596; In Re Tompkins' Estate, Mo.Sup., 341 S.W. 2d 866; Wellston Fire Protection Dist. v. State Bank & Trust Co., Mo.App., 282 S.W.2d 171. See 26 Mo.Digest, Statutes, ☞173, pages 42, 43, pocket part.

■■ The history of legislation relating to neglected children prior to the enactment of these statutes has continuously afforded an appeal. We find there is nothing in the amended statute which would justify this court in holding that the legislative intent was to deny an appeal as provided in section 211.261 of the laws of Missouri 1957. The law favors constructions which harmonize with reason, and which tend to avoid unjust, absurd, unreasonable or confiscatory results or oppression. Kansas City v. Travelers Insurance Co., Mo.App., 284 S.W.2d 874. We find no merit in this contention.

The transcript of the record shows that Frank C. Burgess is a member of the armed services of the United States and is now stationed at Fort Leavenworth, Kansas; that in 1952 he was married to his present wife and shortly thereafter was sent to France where he was stationed for some three years. While in France he and his wife adopted Faith and Loren, two of the minor children involved in this proceeding, and brought them to this country in 1956 when he was transferred to Fort Leonard Wood. On their return, Mr. Burgess took his wife and the two adopted children to Oakland, California, to an aunt and he returned to Fort Leonard Wood where he was stationed from February, 1956, until August, 1960. His wife and children stayed in Oakland until the following June, 1957, when they returned to Missouri and the parties made their home in Dixon.

Gunda, Ralph and Billy, members of the same family as Faith and Loren, were adopted by Mr. and Mrs. Burgess in 1958 and Mr. Burgess brought them to this country March 17, 1959.

In August, 1960, Burgess was transferred to Fort Leavenworth, Kansas. He had put in an order to go back overseas but instead was transferred to Fort Leavenworth. He testified that it was now his intention to move his family, including the children, to Fort Leavenworth.

Around December 15, 1960, Mrs. Burgess, acting for the family, purchased a two and one-half acre tract of land out in the country about four miles east of Hayden, in Maries County, from a lady in California. The property contained a six room house, four rooms downstairs and two rooms upstairs. Burgess testified that the property was about a quarter of a mile off the Maries County road. The cost of the property was $1200, which the parties borrowed from a Mrs. Cory.

The State's evidence consisted of a report made by the Director of Welfare of Maries County and the testimony of ten witnesses, covering some 140 pages. The evidence is that Frank C. Burgess for more than a year prior to the filing of the petition in question was stationed at Fort Leavenworth, Kansas; that he was only home during holidays, Christmas and Easter; that the custody of the children in question was entrusted to Mr. Burgess' wife, Helen. Most of the time she and the

children lived in or near Dixon, Missouri, but on December 15, 1960, she purchased a two and one-half acre tract of land four or five miles east of Hayden, about a quarter of a mile off the highway in a wooded area. The report of the welfare officer, who visited in the home, showed that the house in which they lived had four rooms, two bedrooms. The children attended school principally in Dixon. In May, Mrs. Burgess secured employment at Meta where she worked for about six weeks. During the term of the employment the children were left at home in the care of the oldest girl, Gunda, who was 12. Mrs. Burgess would get up at 5:00 o'clock, prepare her own breakfast and leave home by 6:00 and not return until 5:00 in the evening.

Gunda testified that her mother hit her in the face with her fist, threw her down on the gravel or rocks and broke a front tooth out. She showed the court the false tooth that replaced the one broken out. She stated that because she had not kept her drawer properly her mother threw her down on the rocks and sat on top of her; that that was when the tooth was knocked out; that the rocks cut her lip and made a big sore. She stated that her mother had hit her quite a few times and knocked out her teeth; that she would just hit them with anything she could get her hands on; that she not only hit her but also hit Faith and Ralph; that she did not hit the younger children so much. She testified that she did hit Billy with a board; that when Faith wet her pants she took the pants and rubbed the skin off of her face; that she had seen her mother knock Faith down on the concrete and cut her chin; that when Faith came out of the toilet her mother threw her down on the concrete floor and made a big scar on her face; that she took her hand and pushed her down on the concrete and that was what caused the scar. She also stated she was present when her mother shoved Faith's face down in a tub of ice water and held her face under because she had spilled some water on the

floor; that she then took Faith's clothes off and made her carry in wood naked while there was snow on the ground. She testified that Faith still had a scar over her left eye from the injuries received when her mother pushed her head in the water. She gave this testimony:

"Q. Now, have you seen your mother strike Ralph with a—any board or a fist or anything? A. With her hammer and screwdriver and hoe and * * * I can't remember."

She said when Ralph did not fix the garden right her mother took the hoe and hit him over the head with it; that she had seen her hit Ralph with a board. She said the time Ralph ran away her mother had hit him with a board that held the window open; that that was the day after she had pushed Faith into the dresser and blacked her eye and Faith had run off.

On cross examination she admitted that her parents had bought clothing, toys, dishes and dolls, for the children; that Faith had a bicycle, Billy and Lonnie had tricycles; that they were given to them at Christmas. She admitted they had plenty of food. She testified that it was when Faith had folded pillow cases that her mother had banged her into the dresser; that she did it quite a few times; each time Faith's head hit the dresser. She stated her father had whipped her but not very many times; that he whipped her with a switch; that when he corrected the other children he used reasonable punishment.

Ralph Burgess testified that he is in the fourth grade in school, nine years old; that he had been in this country two years; that he came over with Billy and Gunda. He said his parents were at that time living in Dixon but the next day after he arrived they moved to the country and he went to another school, then came back and went to Dixon school. At the time he came over he testified his father was in Fort Leonard Wood but, later, went to Ft. Leavenworth, Kansas, where he is now. He testified that

his father left all five children with his mother out in the country; that later they moved over around Hayden in Maries County and his mother changed them from the Dixon school to a school in Maries County; that she got a job at Meta in a factory; that she would go to work about 6:00 o'clock in the morning and return about 5:00 or 6:00 o'clock in the evening; that the five children stayed out in the country by themselves and Gunda did the cooking. He said they went over to the neighbors sometimes to get milk and to play with their children.

He stated that the day before he ran away on the 3rd of July, his mother whipped him, first with a board and then with a switch; that she hit him on the legs and head and he had a bandage on his head where he was cut. He testified that one day he opened the back door and it came loose; that she hammered the door shut and then hit him on the head with the hammer and hit him with the steel part in the stomach and he lost his breath. He gave this answer: "Yeah, she hit all us three with the hammer on the head. She said she's going to hit us in the head with a hammer because she asked her who put that blue dishpan with the stuff in it, and so she—she—she said if she's gonna hit—hit us all, every one of us in the head with the hammer until we tell her. So we all didn't do it. So she hit us in the head with a hammer. She was gonna hit us again so I said I did it. So she took the hammer and hit me on the head all the ways and I ran to empty it."

"Q. Now, Ralph, tell the Judge how often would she—how often would she whip you in the two years you've been over here, how often has she whipped you? A. Well, she just about whipped us every day, just about, but not every day, but a week, in the middle, Saturdays mostly.

"Q. And what would she generally whip you with? A. A board. And then Miss Sigler told her about the switch and she started using the switch and board both. Once I had to eat a watermelon rind, rind and all, because I didn't—she didn't tell me

that she was going to make them out of pickles. So I took quite a few watermelons and threw them over the chicken pens because that's where we keep them all the time. So I threw it over there, and she asked me what I did with my watermelon rind, and I said, 'I threw it over the chicken pen'. And she said, 'Go out there and get it.' So I did." He testified she made him eat these rinds; that she gave him five minutes to eat them and she said if I didn't eat them within that time she would poke them down me and hit me with a piece of wood from behind the stove.

He testified that he heard the testimony of his teachers about him coming to school with blue marks and a cut on his face. He said he got the marks when his mother slapped him off the piano bench when he didn't play the notes right; that when he went to school the next day Mrs. Bremer saw the markings; that he had gone to school other times with marks on him where his mother had hit him and the teacher saw every one of them. He testified that he had seen his mother hit Gunda with a board and with her fist and also had seen her hit Faith in the face with her fist.

Witness testified that his father was present sometimes when his mother beat him with a board. He said the first time when she beat him on the head it started to bleed and his father told her to stop but she just kept on and finally he stood up and said "Now, quit, that's enough". He stated he ran from her; that she caught him and beat him on the head with a board and his daddy wrapped it up for him. He testified his mother said she was going to send him to an orphanage and that night he slept in the car. He testified that his father was nice to them until he came back from Kansas, when he started beating them with a board. He said his father came back on June 30th before he ran away on July 3rd; that he beat him twice before he ran away.

Faith Burgess testified that she is eight years of age; that she went to school in Dixon; that since her parents have moved

into Maries County she had been going to school over there. She said she was in the second grade and would be in the third next year. She testified that Mrs. Opperman and Mrs. Bremer were her teachers in Dixon; that she heard her teachers tell about her nose and cheeks being skinned up and that it was done by her mother. She said her mother had rubbed her wet pants over her face until it was all raw. She stated that one time she was dusting and had to go to the bathroom but her mother said she couldn't until she had finished; that she ran to the concrete porch and her mother pushed her down on her chin. She showed the court the scar on her chin that was caused by the fall. She testified she spilled water one time on the floor and her mother pushed her head down in a barrel of ice water and held it under the water; that the reason she did this was because she spilled a little water when she was writing on a blackboard and her mother grabbed her and stuck her head down in the rain barrel and cut her face on the barrel; that the scar on her face was caused by that injury; that her mother had struck her in the face other times with a stick or board or anything.

Witness stated when she came down to Mr. Hutchison's office she had a black eye and a cut over her left eye. She said she had folded some pillow cases and did not fold them right; that her mother then pushed her against the knob of the dresser several times; that this caused her to have the black eye and cut over her left eye. She testified she had gone to school before this time with black eyes caused when her mother would hit her in the face with her fist. She stated she would have to stay out of school several days at a time because of her black eyes and scabs on her face; that her mother had told her to say she fell down and she stated she would say she bumped it. She stated that her mother threatened to beat her if she told what caused the wounds; that the day she ran away from home her mother said she was going to send her to an orphanage and had her get all her clothes ready. She said the reason she ran away

was because of the beating her mother had given her with a board on her legs.

Sheriff Shockley testified that he was called to Hayden's store on July 4th and there picked up Ralph Burgess; that at the time he observed bruised places on the back of his legs and a cut on his forehead; that the boy told him he was afraid to go back home. The sheriff turned the boy over to Mr. Hutchison, Juvenile Court officer who called in Mrs. Elley, Welfare Director of Maries County; that Mr. Burgess was likewise called and he brought in the rest of the children. The sheriff testified he was present when the other children came in and observed that Faith had a cut over her left eye and it was all black.

Marguerite Elley testified that she was Director of the County Welfare Office of Maries County and was present in the office of the Juvenile Court officer and there talked to Ralph Burgess; that he had blue stripes on the calves of his legs, behind his knees, a cut on the top of his head and a large lump on the back of his head; that the boy told her these injuries were caused when his mother whipped him with a board. She testified that the bruises and welts were still in evidence. She said she was present when Mr. and Mrs. Burgess brought the other children into the office; that she had Gunda, Ralph, Faith and Loren go down to her office where she was joined by the sheriff and the juvenile court officer. She stated Ralph spoke only of being beaten on his legs with a board; that Gunda, Faith and Loren stated their mother had whipped Ralph and that she always whipped them with a board; that Faith had run away a day or two before Ralph but she got lost and returned. She testified that the children told her that Faith's black eye was caused because she had folded the pillow cases lengthwise; that her mother had requested they be folded crosswise; that when the mother found Faith putting them in the drawer she bumped her head against the dresser or chest of drawers. She stated Faith's eye was swollen, bruised

clear down below her cheek bone and there was a small cut in the eye brow; that her eye was completely black. She said the reason the children were absent from school was because of the beatings received from their mother. She described the home in which the mother and children lived as being a small four room house, two bedrooms, in a remote area where it was very rough and wooded.

Leroy Opperman, Principal in the Dixon schools testified that Faith and Gunda attended the school where he taught; that during the second month of the last school year Faith came to school with the skin rubbed off her nose and her cheek and nose were almost a solid scab; that she had been out of school all of the preceding week. He testified that he observed Faith and Ralph coming to school with injuries on their faces numerous times; that it appeared to him there was never a week or two at the most that there weren't some bruises or cuts on their faces. His testimony was that the children would be absent from school from five to eight days before they would come back with bruises on their faces lots of times; that their faces were bandaged so the teachers could not see exactly the extent of the injuries; that Faith's eye and under her eye brow and chin were bandaged but you could see the bruises on them. He said Ralph came to school with bruised cheeks and Faith with black eyes; that Ralph's injuries seemed to be finger marks. The school attendance records were offered in evidence showing the children were out of school most of the time. Sometimes they were out the entire month. Witness testified that Mrs. Burgess would write and say she feared Faith had rheumatic fever and that Major Purcell had ordered her to bed; that he called Fort Leonard Wood and found that Purcell was a nurse and that she denied she had ordered the child to bed. He stated that Faith had more cuts and bruises than the others.

Witness stated that because of the injuries appearing on the children he contacted Mrs. Benage, county health nurse, and asked her to visit in the home; that she made her report that the mother was trying to discipline them too severely. All of the evidence was that the children were well behaved and their conduct was good, both at school and on the bus from school to their home.

Helen Opperman, a first grade teacher in Dixon schools, testified that she had Faith in her class in the year 1959–60. She described the injuries to Faith's nose and cheeks; that the child told her she had wet her pants and her mother had rubbed her nose in it. She said her cheeks were bruised and the skin was about all off her nose and her face just looked bruised. When asked how many times she had come to school with bruises she stated it was hard to tell but would say six to eight times and maybe more. She testified that Ralph was in the second grade; that he came to school with one eye extremely black and with bruises across his face; that he was out of school several times because of an injury to his foot. She said Faith came to school with blood in the wrinkles around her mouth and she said it was caused by her mother forcing her to eat ice cream. She corroborated her husband's testimony that Faith's attendance was not regular. She said she reported the condition of the children to the principal. She examined the scab on Faith's face and testified that it extended from between the eyes to the tip of her nose; that it was sore, maybe solid, all through the cheek. She stated that other times she had observed bandages on each of Faith's eyebrows and said that the children were well behaved and there was no disciplinary problem with them in the school.

Mrs. Bremer, a teacher in the Dixon schools, testified that both Faith and Ralph attended her classes; that she observed these children on various occasions coming to school with cuts and bruises on them; that Faith came with her eyes blacked. She said this happened many times. She ob-

served the cuts on Faith's chin and top of her head. She said she came to school with scabs on her cheeks and nose. She gave this answer: "Practically the whole time she was in my room she had scars on her face". She was unable to say the exact number of days the children were absent but she said they were absent more or less continuously during the two years. She particularly remembered slap marks across Ralph's eyes and on his face. She said the marks were blue or black and his eyes were black and she testified that this wasn't the only occasion she had noticed injuries on him; that there were other times when he was skinned. She said Ralph would be absent from school frequently and when he would return he would have these injuries. She testified she talked to Mrs. Burgess in the park; that Mrs. Burgess told her that Faith did not want to come to school; that she had piddled around and missed the bus and, as a punishment she made her clean out the outdoor toilet and she said she was going to take her home and make her move a woodpile. She testified that Faith told her she wanted to come to school; that after the talk Mrs. Burgess came to the school and asked for Faith's things; that when she asked what Faith was going to do Mrs. Burgess told her it was none of her business; that Faith never came back to school.

Mrs. Eunice Sooter, a housewife, testified that when she went to pick up her daughter at school she saw Faith with her face and cheeks all skinned up; that she had a conversation with Mrs. Burgess about it and she stated Faith had a habit of wetting her pants so she just took them off, they were heavy cotton pants, and rubbed the hide off of her nose with them.

The testimony of appellants was principally a denial of the charges made but Mrs. Burgess did admit that she had broken Faith's arm but stated she was playing with her when she did it.

Appellant, Frank C. Burgess, urged only one point in his brief: That the court erred in terminating the parental rights of Frank C. Burgess individually and in terminating the parental rights of Frank C. Burgess and Helen Burgess, parents of the children, because:

A. The evidence failed to show that the parents or either of them, being financially able, have willfully neglected to provide the children with necessary subsistence and other care necessary for their health, morals or welfare for one year or more immediately prior to the filing of the petition.

B. There is not sufficient evidence to sustain the judgment terminating the parental rights of Frank C. Burgess.

C. There is not sufficient evidence to sustain the judgment terminating the parental rights of Frank C. Burgess and Helen Burgess.

D. Neither the petition nor the first amended petition requested parental rights be terminated nor did the petition or the first amended petition indicate such request or state the reasons why such termination was sought.

Our review of the proceedings is accordingly limited to these matters which are the only points contained in appellant's brief under points and authorities. Sykes v. Stix, Baer & Fuller Co., Mo.App., 238 S.W.2d 918, 920 [6]; State v. Couch, Mo. App., 294 S.W.2d 636, 638 [1].

On appeal in neglected child cases, reviewing court examines the record, bearing in mind that deference must be extended, especially on credibility, to trial court's point of vantage in seeing and hearing the witnesses. State v. Greer, Mo.App., 311 S.W.2d 49, 50 [3–6]; Rex v. Rex, Mo.App., 217 S.W.2d 391, 393, 394. We also indulge the presumption that the court's decision was motivated by what is believed was best for the child. We are mindful that parents are not to be deprived of care, companionship and responsibility of their child except for grave reasons and such as are authorized by legislative enactment. The law was stated by this court in Ed-

wards v. Engledorf, Mo.App., 192 S.W.2d 31, 33, that:

"The presumption is that the best interest of the child is to be in the custody of the parent * * *.

"The parents have a right to the custody of their children by nature and by law, which rights should never be denied except for the most cogent reasons, * * *."

The petition by the State in this case is founded on § 211.283, H.B. 437, Laws 1959, carried in the Revised Statutes 1959 as § 211.441, and reads:

"Court may terminate rights, when—consent, how established.—

"1. The juvenile court may, upon petition filed as provided in other cases of children coming under the jurisdiction of the court, terminate all rights of parents to a child when it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

"(1) When the parents have consented in writing to the termination of their parental rights.

"(2) When it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the petition

"(a) The parents have abandoned the child;

"(b) The parents have willfully, substantially and continuously or repeatedly neglected the child and refused to give the child necessary care and protection;

"(c) The parents, being financially able, have willfully neglected to provide the child with the necessary subsistence, education or other care necessary for his health, morals or welfare or have neglected to pay for such subsistence, education or other care when legal custody of the child is lodged with others;

"(d) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the child;

"(e) The parents have been found incompetent under chapter 475 RSMo, and are incapable, and there are reasonable grounds to believe that they will continue to be incapable of giving the child necessary care and protection. * * *"

Section 211.284, H.B. 437, Laws 1959, carried in the Revised Statutes of Missouri 1959 as § 211.451 provides:

"The petition for termination of parental rights shall include:

"(a) the name, sex, and date and place of birth and residence of the child,

"(b) the relationship of the petitioner to the child, or the fact that no relationship exists,

"(c) the name and address and date of birth of the mother if the child was born out of wedlock, and the father of a child born out of wedlock who has acknowledged paternity of the child in writing or has been adjudged the father, or the names and addresses and dates of birth of the parents of the child if born in wedlock,

"(d) the name and address of the person holding legal custody or guardianship of the person, or acting in loco parentis, or the organization or agency holding legal custody of providing care for the child,

"(e) the reason or reasons why termination of the parental rights is sought."

Section 211.285, H.B. 437, Laws 1959, (§ 211.461 RSMo 1959, V.A.M.S.) provides for the hearing and summons of persons in the termination of parental rights.

An examination of the petition shows that the pleader complied with the requirements of the statute for the termination of parental rights. The reason or reasons why termination of parental rights was sought is set out in the petition in para-

graphs 5, 6, and 7. The transcript of the record shows that the requirements of § 211.285, H.B. 437, Laws 1959, (§ 211.461 RSMo 1959, V.A.M.S.) have been complied with.

 Under the evidence we find that the parents have willfully neglected to provide the children with care necessary for their health, morals or welfare for one year or more immediately prior to the filing of the petition. We find there was substantial evidence to sustain the judgment terminating the parental rights of Frank C. Burgess and the parental right of his wife, Helen Burgess. Especially, do we find that under provisions of section 211.283(b), H.B. 437, Laws 1959, the parents have willfully, substantially and continuously or repeatedly neglected the children and refused to give them necessary care and protection.

The custody of these children at least for more than one year while Frank C. Burgess was stationed in Leavenworth, Kansas, as a member of the army, has been in the care of Mrs. Burgess. These five children have been punished repeatedly in a cruel and inhuman manner, leaving scars on the bodies of the three oldest children which caused two of the children, Ralph and Faith, to run away from home. The evidence by appellant's witness, a neighbor living a half mile from the home, stated that Gunda, while in his home, cried and said that somebody would have to help them because Mrs. Burgess was so mean. We agree with the decision of the trial court that Mrs. Burgess willfully neglected to provide the children with "proper and necessary parental care essential to the morals, health and welfare of said children" and that the court was justified in finding that it was in the best interest and welfare of said children that the parental rights of Frank C. and Helen Burgess should be terminated.

We did not set out all of the facts. While the evidence disclosed that proper clothing and food was furnished these minor children it also disclosed that the home, bought by Mrs. Burgess, was not paid for; that she borrowed all the money from a neighbor, Mrs. Cory, to pay for the same and there is still more than $1,000 due; that most of the fixtures and furniture in the home were bought on the instalment plan and have been turned back to the sellers; that all of the household goods have been packed for removal to Fort Leavenworth, Kansas, out of this state. The evidence is that the children have been placed in a suitable home and are now happy and contented. We find no merit in the alleged errors of appellants.

The judgment is affirmed.

RUARK, P. J., and STONE, J., concur.