402 S.W.2d 629 (1966)
In the Interest of J. L. L., a child under 17 years of age.
No. 8499.
Springfield Court of Appeals, Missouri.
April 18, 1966.
*631 Dorothy F. Roberts, Lamar, Frieze & Crandall, Arkley W. Frieze, Carthage, for appellants, the adoptive parents.
Gordon R. Boyer, Pros. Atty., Lamar, for the State.
STONE, Presiding Judge.
In this statutory proceeding under our Juvenile Act [Sections 211.011 to 211.431], the adoptive parents of J_____ L_____ L_____, a girl six years of age, appeal from the judgment of the juvenile court entered on June 28, 1965, which found that the girl was a neglected child "in need of care and treatment" [Section 211.031] and committed her to the care and custody of the division of welfare under the continuing supervision of the juvenile court. Section 207.020(17). (All statutory references are to RSMo 1959, V.A.M.S., and all references to rules are to the Rules of Civil Procedure, V.A.M.R.) The petition filed by the juvenile officer in the juvenile court [Section 211.091] specifically charged physical abuse of the girl, and the evidence at the hearing was directed toward that charge. No complaint is made concerning the form, substance or sufficiency of the petition, but the principal contention of the adoptive parents is that the evidence was "wholly insufficient" to permit the court's finding that the girl was a neglected child. Before discussing the event which precipitated the institution of the neglect proceeding, it may be helpful to note certain background information.
The adoptive mother, forty-four years of age at the time of hearing, is the natural maternal grandmother (hereinafter referred to as the grandmother) of the girl. The record leaves us in doubt concerning the here unimportant detail as to whether the adoptive father, whose age is not given, is the natural grandfather or the stepgrandfather. The only revealed fact pertaining to the girl's early years was contained in the grandmother's statement that "I've had her practically since birth," inferentially for undisclosed reasons arising out of the natural mother's "past"a subject which the court charitably curtained from view when the natural mother made a fleeting appearance on the witness stand. However, the feeling of the grandmother toward the natural mother was made manifest at the hearing (a) by the natural mother's undisputed statement that "my mother had wrote and told me that I wasn't welcome there at the house to see my little girl; she told me that before I left the last time" and (b) by the grandmother's query to the court, when informed of his finding at the close of the hearing, "you ain't going to turn her [the girl] back over to the mother?"
The grandparents obtained their decree of adoption and thus became the adoptive parents of the girl in 1964, only "a few months" prior to the neglect proceeding. The attorney, who was guardian ad litem for the girl in the adoption proceeding, was called as a witness in the neglect proceeding. When asked about his investigation and recommendation in the adoption proceeding, he stated that, even though the grandmother had been "quite strict with the child," he had been of the opinion that she was not mean or abusive and that, "since it was the only home that the child had ever known," he had recommended that adoption be decreed. He observed that "perhaps from the health standpoint it was not too good because of [the grandfather's] condition," which, although not developed in evidence, was such that the grandfather was in a state sanitarium at the time of the occurrence giving rise to the neglect proceeding. However, we record parenthetically that he was home when the proceeding was instituted on June 21, 1965, was served with summons on that date, and was represented by counsel at the hearing on June 28. That the possibility of obtaining additional financial aid may have been one of the considerations motivating the grandparents' petition for adoption of the girl is suggested by the grandmother's inquiry, after being informed of the court's decision in the neglect proceeding, "will they have to take the disability social security *632 and return it back to the social security office?"
About 6:40 A.M. on Tuesday, June 15, 1965, witness Lucille T_____, who lived in the second house from the grandparents' home, heard the grandmother "beating the child" and "the little girl crying." The witness said that it continued until about 7:15 to 7:20 A.M. when the girl "commenced crying `Mama'""those cries of `Mama' would just make your blood run cold""you could tell from the voice that the child was just desperate." The grandmother "was in a rage""not going to have this in my house." Since she did not see the beating, the witness did not know what the grandmother was using; but the witness insisted that whatever was in use was striking "flesh." As the witness put it, after "I took over thirty minutes of it. . . I called [the county welfare director] to get some help."
At the request of the welfare director, peace officers went to the grandmother's home and asked her to take the girl to the director's office, which she did. The welfare director had known the girl "for a long time""she is a very attractive, weak child." Observing the stripes and bruises on the girl's arms and legs and a deep cut and bruise on her left temple, the welfare director told the grandmother "that we wanted to take the little girl to a doctor." There was no formal request for the grandmother's permission and, on the other hand, the grandmother voiced no objection to the proposed examination. Whereupon, the girl was taken to the office of a medical doctor, who examined and treated her and arranged for twelve black-and-white photographs of the girl to be made while she was still in his office.
Upon hearing, the doctor testified that the girl had "numerous traumatic injuries to her skin and to her soft tissue," including many bruises and contusions, some of which were "actually superficial lacerations," on her head, neck, thorax, buttocks, thighs and legs, and a "laceration area with acute swelling and bruising" on the left forehead and temple. Some of the girl's injuries were fresh while, in the doctor's opinion, the duration of other injuries ranged from twenty-four hours to two weeks. The bruises, contusions and lacerations were so numerous that, when the court invited the doctor to count or estimate their number, the latter thought that "it wouldn't be impossible but it would be a task." The twelve photographs, in their totality, portray the entire head, body and extremities of the girl and establish, even more graphically and indisputably than the clear, cogent and compelling testimony of the medical examiner, the veritable multitude of grievous hurts inflicted on the girl.
The grandmother did not deny, and could not well have done so, the existence of multiple indicia of trauma to the girl. In fact, she testified that, when the peace officers had come to her home on the morning of Tuesday, June 15, she (the grandmother) had been, at that very moment, engaged in getting the girl "ready to go to the doctor," an osteopath who had been the "family physician for approximately eighteen months." However, the grandmother did deny that she had inflicted any of the bruises, contusions or lacerations and undertook to account for them by a vivid recital of the following-described series of alleged incidents in which (so she said) the girl had sustained those objective evidences of trauma.
(1) On Saturday, June 12 (three days prior to the medical examination), the girl had fallen through a hole in the rotten bed of a farm trailer sitting in the back yard. This had "blackened her leg," which the grandmother "was doctoring myself." (2) About 2:30 P.M. on Monday, June 14, the girl had fallen some ten to eleven feet out of a tree, while emulating the miraculous feats of "Superman." "She [the girl] got up and run off and just rubbed her head and went on playing just the same with the other kids." (3) While the grandmother was mowing the back yard about 5 P.M. on Monday, June 14, the girl and three *633 of her cousins (two girls, six and five years of age, and a boy, three years old, temporarily in the grandmother's care) "had a hickory fight" with some switches in the front yard. (4) Shortly after the grandmother had stopped the "hickory fight" and had gone to the garden to gather beans, she "heard a scream" and, returning to the front yard, found the children "fighting" and striking each other with toy brooms and a toy gun. She took the girl inside "and rubbed this lotion on her." (5) About 7 A.M. on Tuesday, June 15, the girl had a pillow fight in bed with her dog, who "scratched her down the front with his toenails." The grandmother "hollered" at the girl, "don't lay there and wet the bed"; but, either before or after that admonition, the girl did "wet the bed." When she got out of bed, the girl "come on running . . . right by the heater and she either tripped over her doll or else the dog reared on her and knocked her down and she bumped her head on the side where it was cut .... About that time I just retched down and spanked her tail and told her to get in there so I could get the wet bloomers off of her and change her and get her ready to go to the doctor.... So about that time the law rolls up . . .."
The welfare director testified that, when the girl was brought to her office, the grandmother first told her that "a little niece had pushed [the girl] down on the sidewalk and the dog had scratched her and then she later told me that she had tickled [the girl] with a switch and . . . that she had used her hand on her." In fact, the grandmother "changed her story I don't know how many times" about the manner in which the girl had sustained her injuries "she [the grandmother] told me one thing and then when she realized she was headed for trouble, she told me something else."
In urging their contention that the evidence was "wholly insufficient" to permit a finding that the girl was a neglected child, counsel for the grandparents brand witness Lucille T_____ as having had "a rather vivid imagination which ran away with her sense of reasoning and resulted in the making of a complaint" to the welfare director, and they dismiss her testimony as "not considered [by them] to be of any particular value in this proceeding." Nevertheless, in interrogation of the grandmother, her counsel sought to explain in part, rather than to deny in its entirety, the testimony of witness Lucille by conceding that, in fact, the grandmother had been "hollering at the child" that morning and the girl had been screaming, but showing that none of this was caused by physical abuse or even corporal punishment. To that end, the grandmother testified: "That morning, yes, I hollered in there at the child and she jumped up and down and when I said I'd have her dog shot she says, `I won't do it again; I won't do it again, Mommy' . . .. She jumped up and down and screamed and run around there, and I just picked up the featherbed and carried it out that she had wet on . . . and I went back and I says, `well, you just scream it up.' I says, `shut up and get in the bathroom so I can get you changed.'"
At the conclusion of the hearing, the discerning trial judge told the grandmother that, although "I don't want to be unnecessarily harsh with you or to hurt you unnecessarily. . . I'm frank to say that I don't believe your story about how she got the bruises."
It is true that, as counsel for the grandparents emphasize, the court's rejection of the grandmother's proffered explanation of the girl's injuries did not constitute affirmative proof that the grandmother had inflicted any of those injuries. In the case of In re M_____ P_____ S_____, Mo.App., 342 S.W.2d 277, 282-283, upon which the grandparents in this proceeding principally rely, the record was utterly devoid of evidence from which the trier of the facts reasonably could have identified and fixed responsibility upon any particular individual for the injuries to the minor subject of that judicial inquiry. That is not the situation in the case at bar, for the transcript before us contains the significant *634 testimony of witness Lucille who heard the grandmother "in a rage" and "beating the child," heard the girl's "cries of `Mama' [that] would just make your blood run cold," knew "that the child was just desperate," and "took over thirty minutes of it" before she (witness Lucille) called for help. We also note the testimony of the examining doctor that, in response to an inquiry by him, the girl had said that "that morning she had been hit by her [grandmother], that this caused her to fall and she struck her head on the side of the step.' Regardless of whether some of this testimony might have been excluded upon timely and appropriate objections or motions to strike, its probative worth and effect were for the trier of the facts, since it was received without such objection or motion.[1]
In this court-tried proceeding, we accord due regard to the opportunity of the trial court to judge of the credibility of the witnesses,[2] and we indulge the presumption that the decision of the trial judge was motivated by what he believed would be best for the child. In re Burgess, Mo.App., 359 S.W.2d 484, 492; State v. Greer, Mo. App., 311 S.W.2d 49, 51(5). Of course, we remain mindful that the grandparents are the adoptive parents of the girl and that, in neglected child proceedings as in other cases, parents are not to be deprived of the care, custody and companionship of their children except for grave reasons [State v. Pogue, Mo.App., 282 S.W.2d 582, 588(6-8); State v. Greer, supra, 311 S.W.2d at 51(6); In re O_____, Mo.App., 372 S.W.2d 512, 514(2)]; but, in any proceeding involving the custody of a minor child, the consideration of supreme importance which transcends and overrides all others is the welfare of the child.[3] As our courts repeatedly have emphasized: ". . . the issue of the welfare of the child . . . is an issue always to be kept in view in all legal proceedings involving the custody and control of a minor child as to which the state stands in the relation of parens patriae. In other words, whenever a minor child is brought within the jurisdiction of a court for an adjudication with respect to the question of its custody, the child becomes the ward of the court; and in determining the question of its ultimate disposition, the child's well-being is of paramount consideration, and the rights and claims of the contending parties, even in the case of the parents themselves, must be subordinated to what the court may conclude will be for the best interests of the child. Ex parte Badger, 286 Mo. 139, 226 S.W. 936, 14 A.L.R. 286."[4] (Emphasis ours) In recognition and application of the quoted principle, parents are deprived of the custody of their children in proceedings of this character, when the welfare of the children so demands.[5]
Without further belaboring the facts, suffice it to say at this point that we are of the considered opinion that the evidence *635 in the instant proceeding permitted and justified the finding that the grandmother had inflicted physical abuse upon the girl; and, with appropriate respect for the above-stated principles, certainly we cannot say that the judgment under review was "clearly erroneous." Rule 73.01(d); Section 510.310(4).
The only other point presented in the grandparents' brief is that the trial court erred in permitting the doctor to testify. Counsel's argument on this point is not that the doctor was an incompetent witness by reason of the physician-patient relationship [Section 491.060(5)], an objection discussed and disallowed in the case of In re M_____ P_____ S_____, supra, 342 S.W.2d at 283 (9-11), but rather that the doctor should not have been permitted to testify because, when he examined the girl on June 15, 1965, the juvenile court had not ordered the girl to be taken into custody [Section 211.101 (3)], the jurisdiction of the court over the girl had not attached [Section 211.131], and the court had not ordered an examination of the girl. Section 211.161(1).
The stated point has not been preserved for our consideration. "The practice and procedure customary in proceedings in equity shall govern all proceedings in the juvenile court." Section 211.171(6). In proceedings in equity as in actions at law, the mandatory requirement is that, excepting only those questions particularized and enumerated in Rule 79.03, errors must be presented to the trial court in a motion for new trial in order to be preserved for appellate review.[6] The grandparents-appellants in the instant proceeding filed no motion for new trial. Nevertheless, their principal complaint, i. e., that the evidence was wholly insufficient to permit the court's finding that the girl was a neglected child, has been accorded our careful, conscientious consideration and has been ruled on its merits as is proper under our appellate procedure.[7] But their complaint that the trial court erred in permitting the doctor to testify has not been preserved for review.
With respect to that assignment of error, we recall, however, (a) the grandmother's testimony that, when the peace officers asked her to take the girl to the welfare director's office, she was engaged in getting the girl "ready to go to the doctor" and (b) the welfare director's uncontradicted testimony that, when she told the grandmother "that we wanted to take the little girl to a doctor . . . she [the grandmother] didn't object." The grandparents have not invoked our consideration of any alleged error under Rule 79.04; and, in the recorded circumstances of this case, we sense no "manifest injustice or miscarriage of justice" [Rule 79.04] which would justify further discussion, sua sponte, of the complaint about the doctor having been permitted to testify. In re C_____, Mo. App., 314 S.W.2d 756, 760. See Gosnell v. Gosnell, Mo.App., 329 S.W.2d 230, 234-235(7).
The judgment is affirmed.
RUARK and HOGAN, JJ., concur.
NOTES
[1] P_____ D_____ v. C_____ S_____, Mo.App., 394 S.W.2d 437, 443(4); Fellows v. Farmer, Mo.App., 379 S.W.2d 842, 846(2); Turner v. Yellow Cab Co. of Springfield, Mo.App., 361 S.W.2d 149, 154-155(1); Edmisten v. Dousette, Mo. App., 334 S.W.2d 746, 753; Vosburg v. Smith, Mo.App., 272 S.W.2d 297, 302(9).
[2] Rule 73.01(d); Section 510.310(4); In re O_____, Mo.App., 372 S.W.2d 512, 514(4); In re Burgess, Mo.App., 359 S. W.2d 484, 492; State v. Greer, Mo.App., 311 S.W.2d 49, 50-51(3, 4).
[3] In re J_____, Mo.App., 357 S.W.2d 197, 200(3); State v. Pogue, Mo.App., 282 S. W.2d 582, 588(10). See Good v. Good, Mo.App., 384 S.W.2d 98, 101(3); C_____ v. B_____, Mo.App., 358 S.W. 2d 454, 459(1).
[4] Ex parte DeCastro, 238 Mo.App. 1011, 1015, 190 S.W.2d 949, 951(1); In re Shepler, Mo. (banc), 372 S.W.2d 87, 90-91(2); In re Duncan, Mo. (banc), 365 S.W.2d 567, 571, 4 A.L.R.3d 1270; In re R. D. H. S., Mo.App., 370 S.W.2d 661, 666(1).
[5] In re O_____, supra note 2; In re Burgess, supra note 2; In re J_____, supra note 3; In re J_____, Mo.App., 356 S. W.2d 508; Minor Children of F. B. v. Caruthers, Mo.App., 323 S.W.2d 397. See In re C_____, Mo.App., 314 S.W.2d 756.
[6] Rule 79.03; Adams v. Richardson, Mo., 337 S.W.2d 911, 915(1); Nickels v. Witschner, Mo., 270 S.W.2d 848, 849(2); State ex rel. Morton v. Cave, 359 Mo. 72, 79, 220 S.W.2d 45, 49(4); Aetna Ins. Co. v. O'Malley, 343 Mo. 1232, 1239, 124 S.W.2d 1164, 1166(3); Gosnell v. Gosnell, Mo.App., 329 S.W.2d 230, 234(5, 6); ABCO Assisting Building Const. Office v. Bagley & Co., Mo.App., 304 S.W.2d 43, 47(2).
[7] Rule 79.03; Handlan v. Handlan, 362 Mo. 1180, 1188, 247 S.W.2d 715, 718(2); Gross v. Merchants-Produce Bank, Mo. App., 390 S.W.2d 591, 594(2); Neustaedter v. Neustaedter, Mo.App., 305 S.W.2d 40, 42(2); Montgomery v. Montgomery, Mo.App., 257 S.W.2d 189, 195-196(1).